In re **SIERRA STEEL CORPORATION**, Debtor.

**Bankruptcy No. 86–B–09653–M.**

United States Bankruptcy Court, D. Colorado.

June 30, 1988.

Douglas E. Larson, Williams, Larson, Foster & Griff, Grand Junction, Colo., for debtor.

David Seserman, Gorsuch, Kirgis, Campbell, Walker and Grover, Denver, Colo., for Colorado Iron Workers Benefit Plans.

**MEMORANDUM OPINION AND ORDER**

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Bankruptcy Court on remand from the United States District Court. U.S. District Court Judge John L. Kane ordered this Court to make appropriate findings and ruling on two issues pertaining to this Chapter 11 Debtor's rejection of a Collective Bargaining Agreement. The essence of the remand is to have this Court determine whether or not the Debtor proceeded correctly, pursuant to 11 U.S.C. § 1113, to reject its Collective Bargaining Agreement with the International Association of

Bridge, Structural and Ornamental Iron-workers, AFL–CIO Local Unions Nos. 24 and 750 ("Union" herein).

The issues before the Court are as follows:

1. Whether the Union refused to accept the Debtor's proposed modifications to its Collective Bargaining Agreement without "good cause"?

2. Whether the balance of equities clearly favor rejection of the Collective Bargaining Agreement, particularly where the Debtor's proposed modification of the Collective Bargaining Agreement contained no "snap-back" provision?

If the answer to both of these questions is yes, then the Debtor will be deemed to have properly rejected, and thus be permitted to reject, its Collective Bargaining Agreement. If the answer to either of these questions is no, then the Debtor will not be permitted to reject the Agreement.

## BACKGROUND AND FACTS

The essential facts and history pertinent to this matter are not in dispute. They are summarized as follows: [1]

1. On October 14, 1986, the Debtor filed a Petition for Relief pursuant to 11 U.S.C. § 301 and 11 U.S.C. § 1101 *et seq.* This Court has jurisdiction over the Debtor by virtue of 28 U.S.C. §§ 1334 and 157.

2. The Debtor is a small business engaged in assembly and erection of reinforcing and structural steel. Its owners, management and principal employees are two individuals who operate the business and serve as hourly laborers as well. Its employees number between three and ten, depending on weather, time of year, and number of contracts. It is somewhat the proverbial "mom and pop" business.

3. At the time of the filing of the Petition for Relief pursuant to Chapter 11, the Debtor was a party to a Collective Bargaining Agreement with the Union. This Bargaining Agreement was a three-year agree-ment, with an expiration date of April 30, 1987, pursuant to Article 27 of that Agreement. Said Collective Bargaining Agreement was designated as "Exhibit A" and admitted at the initial hearing held on March 17, 1987, before the late Judge John McGrath.

4. On November 21, 1986, the Debtor, acting through its counsel, Douglas E. Larson, made a proposal to the Union to modify the existing Collective Bargaining Agreement by reducing the journeyman wage rate from $20.28 per hour to $14.00 per hour. The other terms of the Agreement were to remain unchanged. The Debtor's proposal did not contain any profit sharing, equity sharing, or "snap-back" provisions to provide a greater wage to the Union in the event the Debtor's economic condition improved at a later date. (Exhibit C)

5. The Union did not respond to the Debtor's proposed modification of the Collective Bargaining Agreement as set forth in the November 21, 1986 letter of Mr. Larson.

6. On December 22, 1986, the Debtor sent a second letter to the Union (Mr. Robert Braun). This second letter reiterated the proposed modification of the Collective Bargaining Agreement and provided the Union with all financial statements which had been filed with the United States Trustee's Office pursuant to the Chapter 11 proceeding, and offered to provide the Union with any other data it might require to evaluate the proposed modification of the Collective Bargaining Agreement. This second letter (Exhibit D) requested a response within 15 days from the Union representative and stated an intent to reject the Collective Bargaining Agreement in the event no response was received.

7. The Union did not respond to the second letter from the Debtor.

8. On January 8, 1987, still having received no response from the Union, the Debtor, acting through its attorneys, tele-

---

1. This Court has reviewed the entire trial transcript from the hearing before Judge McGrath, March 17, 1987.

phoned the representative of the Union, Mr. Robert Braun. Mr. Braun admitted that he had received the previous two letters (Exhibits C and D), but he was unable to respond to those letters because of the provisions of the Collective Bargaining Agreement, commonly referred to as the "most favored nations clause" or "equal treatment clause," contained in Article 26 of the Collective Bargaining Agreement in effect between the Union and the Debtor. This particular clause, in essence, requires that in the event the Union modifies a contract with a particular employer, then the same modifications must be offered to every other employer who is signatory to a contract with a similar clause in effect. Since there were numerous other employers (between 52 and 54 employers) who were signatory to similar contracts, with a similar term and clause, Mr. Braun felt compelled to refuse to negotiate with the Debtor. Thus, Mr. Braun stated that it would be pointless for the Union and the Debtor to engage in any negotiations, and that he felt that the Debtor had fulfilled its obligation to negotiate in "good faith" toward modifying the Collective Bargaining Agreement, and that he understood that the Debtor would move to reject the Collective Bargaining Agreement.

9. On January 9, 1987, the Debtor, acting through counsel, sent a third letter to the Union, summarizing the previous contacts and telephone call to the Union, and again announcing an intent to move for a rejection of the Collective Bargaining Agreement pursuant to 11 U.S.C. § 1113(b). The Union did not respond to this letter either.

10. On or about January 19, 1987, the Debtor filed its Motion to Reject the Collective Bargaining Agreement with the Ironworkers Local Union Nos. 24 and 750.

11. The Debtor sent notices to all interested parties and all creditors pursuant to Local Rule of Bankruptcy Procedure No. 23, and the matter was originally set for a hearing to be held on February 25, 1987. No parties objected to the entry of the Order authorizing rejection of the Collective Bargaining Agreement. However, the Trustees for the Colorado Ironworkers Pension Fund, the Colorado Statewide Ironworkers Joint Apprenticeship and Training Trust Fund, the Ironworkers Welfare Plan of Colorado, and the Colorado Ironworkers Vacation Fund (Trustees), had been overlooked as "interested parties" to the Motion to Reject the Collective Bargaining Agreement.

12. On February 20, 1987, counsel for the Debtor contacted the attorney for the Trustees, Mr. Timothy Parsons, of the hearing scheduled for February 25, 1987.

13. The Trustees moved to have the hearing reset because they deemed themselves to be "interested parties" and had not received the requisite ten day notice required pursuant to 11 U.S.C. § 1113(d)(1).

14. Pursuant to the Trustee's Motion, the hearing was reset to March 17, 1987.

15. On March 17, 1987, a hearing was held before the Honorable John McGrath of the United States Bankruptcy Court for the District of Colorado. Representatives of the Debtor and the Trustees appeared. The Ironworkers Union filed no objection, but Mr. Robert Braun of the Union appeared as a witness on behalf of the Trustees. Mr. Braun was the only witness for the Trustees.

16. At the conclusion of the hearing, Judge McGrath issued an Order permitting the Debtor to reject the Collective Bargaining Agreement with the Ironworkers Union. The Trustees appealed, and the Debtor cross-appealed. On September 14, 1987, District Court Judge John Kane issued a Memorandum Opinion and Order, granting both the appeal and cross-appeal on certain points and remanding the case to the Bankruptcy Court for further findings.

17. The Debtor maintains that if rejection of the Bargaining Agreement is not permitted, the Chapter 11 case will, necessarily, be converted to Chapter 7.

## OPINION AND ORDER

Judge McGrath resolved all factual issues in favor of the Debtor pertaining to

whether or not the Debtor could reject its existing Collective Bargaining Agreement.[2]

The only two issues which were remanded for further findings are those embodied in 11 U.S.C. § 1113(c)(2) and (3) as follows:

> (c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
>
> . . . .
>
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and (3) the balance of the equities clearly favors rejection of such agreement.

All other statutory requirements were deemed satisfied.[3]

## WHETHER THE UNION REFUSED TO ACCEPT THE DEBTOR'S PROPOSED MODIFICATIONS TO ITS COLLECTIVE BARGAINING AGREEMENT WITHOUT GOOD CAUSE

█ This Court concludes that the Union did *not* have "good cause" to reject and refuse the proposed modification of the Collective Bargaining Agreement advanced by the Debtor. As set forth in the findings of fact, the main reason that the Union rejected the proposal of the Debtor was the adverse consequences that negotiations with the Debtor would have upon other Union contracts with *other* employers. Negotiations and a modified Bargaining Agreement with the Debtor would have had substantial deleterious impact on other collective bargaining agreements due to the "most favored nations" provision.[4] Thus, even though the Union representative, Mr. Robert Braun, professed that his failure to negotiate with the Debtor was, in part, the result of his desire to see the company succeed, the majority of Mr. Braun's testimony was to the effect that the primary reason for refusal to accept the Debtor's proposal was the affect his negotiations with the Debtor would have as between the Union and *other* employers. This does not comport with the "good cause" contemplated by the drafters of the statute.

The "good cause" which is referred to pursuant to 11 U.S.C. § 1113(b) is to be

---

2. "In his order of April 9, the Bankruptcy Judge [McGrath] made nine specific findings of fact. These were, and I paraphrase, that debtor made a fair proposal to the union representative demonstrating a willingness to negotiate as required by 11 U.S.C. § 1113, that the union representative rejected the proposal in a fair and equitable manner in refusing to negotiate, that the debtor made a good faith effort to negotiate with the union, that the unwillingness of the union to renegotiate with debtor made it necessary for debtor to reject the union contract. He found further that no excessive benefits were being taken by debtor, that the union was given sufficient time and opportunity to evaluate effectively debtor's proposal, that both debtor and the union demonstrated just cause in offering a proposal and refusing to negotiate respectively, that a balancing of the equities favored allowing debtor to reject the contract and that a rejection of the contract was necessary for the effective re-organisation (sic) of debtor." *Colorado Iron Workers Pension Fund, et al. v. Sierra Steel Corp.*, 88 B.R. 314, 315 (D.Colo.1987).

3. "The nine statutory requirements contained in Section 1113 have been identified as follows, (1) The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement, (2) The proposal must be based on the most complete and reliable information available at the time of the proposal, (3) The proposed modifications must be necessary to permit the re-organisation (sic) of the debtor, (4) The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably, (5) The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal, (6) Between the time of the making the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union, (7) At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement, (8) The Union must have refused to accept the proposal without good cause, (9) The balance of equities must clearly favor rejection of the collective bargaining agreement, *In re American Provision Co.* 44 Bankr.Rep. 907, 909 (Bkrtcy.D.Minn.1984)." *See, Matter of Walway Co.*, 69 B.R. 967, 972 (Bankr.E.D.Mich.1987).

4. Approximately 350–400 other union employees, employed by other employers, would have had their contract wages reduced under the "equal treatment clause," from $20.28 to $14.00, the same as the proposed modification submitted by the Debtor.

interpreted narrowly by a reviewing Court. It should be on the basis of facts directly resulting from the contract between the Debtor and his employees, the contract immediately before the Bankruptcy Judge in the Chapter 11 proceeding. It should not involve contracts with Unions or employers other than those immediately before the court.

> In determining whether the Union has refused the debtor's proposal 'without good cause' the court will not consider any other union contract ... which is not directly before the court. *In re Salt Creek Freightways*, 47 B.R. 835, 841 (Bankr.Wyo.1985).

Because consideration of these extraneous contracts with other employers was the primary reason for the Union's refusal to accept the Debtor's proposal, the Union did not have "good cause" as contemplated by 11 U.S.C. § 1113(b). As stated in *Salt Creek Freightways:*

> [I]t is not necessary to find that a Union has rejected the debtor's proposal in 'bad faith' or for some contrary motive. In fact, the Union may often have a principled reason for deciding to reject the debtor's proposal and which may, when viewed subjectively and from the standpoint of its self-interest, be a perfectly good reason. However, the court must review the Union's rejection utilizing an objective standard which narrowly construes the phrase 'without good cause' in light of the main purpose of Chapter 11, namely reorganization of financially distressed businesses. *In re Salt Creek Freightways*, 47 B.R. 835, 840 (Bankr. Wyo.1985).

The conclusion of this Court is reinforced by a review of the Union's conduct in negotiations with the Debtor. The Union refrained from responding to the Debtor's proposal, ignored Debtor's requests for cooperation, refused to enter into negotiations, and effectively "stonewalled" Debtor's efforts to achieve necessary modifications of the Bargaining Agreement. "This tactic is unacceptable and inconsistent with Congressional intent.... This good cause requirement was 'intended to ensure that a continuing process of good faith negotiations will take place before court involvement.'" *Truck Drivers Local 807 v. Cary Transp. Inc.*, 816 F.2d 82 (2nd Cir.1987).

WHETHER THE BALANCE OF EQUITIES CLEARLY FAVOR REJECTION OF THE COLLECTIVE BARGAINING AGREEMENT WHERE THE DEBTOR'S PROPOSED MODIFICATIONS CONTAINED NO "SNAP-BACK PROVISIONS"

■ This Court concludes that the balance of equities, in these circumstances, clearly favor rejection of the Bargaining Agreement even though the Debtor's proposed modifications contained no "snap-back" provisions.

The purpose of the provisions of 11 U.S. C. § 1113, is to force a Chapter 11 debtor to negotiate with a union in a good faith manner before summarily rejecting it pursuant to 11 U.S.C. § 365. *See, In re Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO, CLC*, 791 F.2d 1074, 1081 (3rd Cir.1986) and *In re Salt Creek Freightways, supra* at 840.

In the instant case, the Debtor submitted a proposal to modify the Collective Bargaining Agreement. The Debtor supplied all relevant financial data at its disposal, and offered to supply the Union with any additional financial data necessary for the evaluation of the proposal. The Debtor repeatedly requested the Union to engage in negotiations concerning this proposal, and announced a clear intent to reject the Collective Bargaining Agreement if a compromise could not be reached regarding the Debtor's proposed modification of that Agreement. The Union agreed that the Debtor had met its burden of negotiating in good faith, yet failed to respond in any way to the Debtor's proposed modifications of the Collective Bargaining Agreement. Thus, the Debtor did all it could within its power to modify the Collective Bargaining Agreement prior to moving for Court approval for rejection of that Agreement.

The absence of a "snap-back" provision is not fatal to the Debtor's Motion to Reject

the Collective Bargaining Agreement. A "snap-back" proposal is not a pre-requisite to a finding that the balance of equities favors rejection of a Collective Bargaining Agreement. *See, In re Matter of Walway Co.,* 69 B.R. 967, 974 (Bankr.E.D.Mich. 1987). Although the absence of a "snap-back" provision was deemed fatal in the *Wheeling–Pittsburgh* case, the Court was careful to state that the ruling in that case was limited to the facts and circumstances of that case. The facts and circumstances of this case are significantly different than in *Wheeling–Pittsburgh.* In *Wheeling–Pittsburgh,* the Court found that a "snap-back" provision should have been included because it was not shown by the Debtor that the proposed modification was "necessary," or that the proposed modification of the Collective Bargaining Agreement was "fair and equitable." In the present case, the Court has already found that the proposal was necessary and was fair and equitable to all parties, and the District Court upon remand has upheld both of those findings.

Judge McGrath previously found, and Judge Kane confirmed, that the Debtor's proposal was fair and equitable as to all creditors, the Debtor, and all affected parties.[5] The absence of a "snap-back" provision does not, in itself, overcome the finding that the proposal was fair and equitable. This Court agrees that while it is imperative to consider the absence of a snap-back provision in the context of fairness and equity, it is not, necessarily, the paramount, decisive factor in deciding whether the equities clearly favor rejection of the Bargaining Agreement. In the case at bar and under the circumstances of this Debtor, the absence of a snap-back provision is *not* an indication of inequitable treatment or an inequitable result. *Matter of Walway Co., supra* at 974.

The expiration of the Bargaining Agreement by its own terms on April 30, 1987, a mere six weeks following the original hearing held in this case on March 17, 1987, is an additional feature that reinforces the conclusion that the balance of the equities clearly favors a rejection of this Collective Bargaining Agreement. Article 27 of the Collective Bargaining Agreement provides, *inter alia,* that the contract will remain in effect until April 30, 1987, and unless written notice is given at least sixty days prior to April 30, 1987 (or in other words by March 1, 1987), the contract will continue for an additional year. The contract specifically states that any notice for a desire to terminate or change the Agreement at the end of the current contract year will have the effect of terminating the agreement at such time.[6] The Debtor's numerous letters to the Union all clearly expressed a desire to modify that contract and/or terminate the contract. All three letters were dated and received prior to March 1, 1987. Accordingly, the contract would expire, at the latest, April 30, 1987. Inclusion of a "snap-back" provision in the Debtor's proposal to modify the Union contract would have been a meaningless gesture in the face of the expiration of that contract in any event. The Company/Debtor would not have been

---

5. "Here there were a number of factors on the basis of which the court could find the parties were treated equitably, not least of all the fact management themselves had taken substantial wage reductions and injected personal resources into the company. I decline to interfere with the trial judge's determinations in this regard." Judge Kane's Memorandum Opinion, *supra* at 5. Indeed, the owners/management had taken greater wage reductions than other employees, had received no compensation as directors and managers of the business, and contributed cash to maintain operations, as well.

6. Agreement, Article 27, Duration and Termination

"This Agreement, with any amendments thereof made as provided for therein, shall remain in full force and effect until midnight of April 20, 1987, and unless written notice be given either party to the other at least sixty (60) days prior to such date of a desire for change therein or to terminate the same, it shall continue in effect for an additional year thereafter. In the same manner, this Agreement, with any amendments thereof shall remain in effect from year to year thereafter, subject to termination at the expiration of any such contract year upon notice in writing given by either party to the other at least sixty (60) days prior to the expiration of such contract year. Any such notice as hereinabove provided for in this Article, whether specifying a desire to terminate or to change at the end of the current contract year, shall have the effect of terminating this Agreement at such time.

obligated under any contract subsequent to April 30, 1987.

Finally, with regard to the balance of equities, it bears noting that there has never been an allegation that this Chapter 11 Petition was filed solely for the purpose of breaking the Collective Bargaining Agreement. The President of the Debtor, Mr. Joe Vigil, Jr., testified without contradiction that this bankruptcy was filed because of pressure that the company was receiving primarily from the Internal Revenue Service, and not because of its difficulties with the Union.

Bankruptcy courts "must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization." *Truck Drivers Local 807 v. Cary, supra* at 92; *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). In accord with this standard, this Court is persuaded, by a clear and convincing margin, that the equities favor rejection of the Bargaining Agreement.

IT IS THEREFORE ORDERED that, the Debtor having fully satisfied the remaining statutory requirements of 11 U.S.C. § 1113 authorizing rejection of collective bargaining agreements, the Court hereby approves the Debtor's rejection of the aforesaid Collective Bargaining agreement effective March 17, 1987.