**In re ALABAMA SYMPHONY ASSOCIATION, Debtor.**

**BIRMINGHAM MUSICIANS' PROTECTIVE ASSOCIATION, LOCAL 256–733, OF THE AMERICAN FEDERATION OF MUSICIANS, Appellant,**

v.

**ALABAMA SYMPHONY ASSOCIATION, Appellee.**

Bankruptcy No. 93–00457.

No. CV–93–B–1385–S.

United States District Court,
N.D. Alabama,
Southern Division.

Sept. 30, 1996.

Jerry W. Schoel, Schoel Ogle Benton & Centeno, Birmingham, AL, for Birmingham Musicians' Protective Ass'n, Local 256–733, of American Federation of Musicians.

John P. Whittington, Patrick Darby, Bradley Arant Rose & White, Birmingham, AL, for Alabama Symphony Ass'n.

Patricia Polach, Bredhoff & Kaiser, Washington, DC, for American Federation of Musicians of U.S. and Canada.

## MEMORANDUM OPINION

BLACKBURN, District Judge.

This case is before the court on appeal from a decision in the United States Bankruptcy Court for the Northern District of Alabama, entered May 17, 1993, allowing the

appellee to reject a collective bargaining agreement and limit its benefit payments under the cafeteria plan. After reviewing the record and the submissions of the parties, the court is of the opinion that the decision of the bankruptcy court is due to be affirmed in part and reversed in part.

## FACTUAL BACKGROUND [1]

The Alabama Symphony Orchestra Association ("the Symphony") was formed in 1933 and reincorporated under Alabama's laws for nonprofit organizations in 1982, and was known as the Birmingham Symphony Orchestra. It took its current name in 1986. Prior to filing its Chapter 11 bankruptcy petition, the Symphony conducted a season of 45 weeks, during which it presented 75 concerts throughout the state. The Symphony employed 85 people, including 74 musicians.

The Alabama Symphony Foundation ("the Foundation"), a distinct legal entity, was incorporated in 1987 with the purpose of supporting the Symphony by the establishment of a permanent endowment fund. At the time of the bankruptcy court's order, the Foundation held approximately one million dollars in the endowment, on which it received approximately $50,000.00 to $70,000.00 per year in interest.

The Birmingham Musicians' Protective Association ("the Musicians") is a division of the American Federation of Musicians, and it is the collective bargaining unit to which the musicians belong. It is an authorized collective bargaining unit pursuant to the Labor Management Relations Act, 29 U.S.C. §§ 141–197.

The 1991–1994 Collective Bargaining Agreement ("the CBA") between the Symphony and the Musicians is a comprehensive document detailing the working relationship between the parties, including such particulars as wages, benefits, and the physical environment in which the musicians perform. The CBA provides for wages in its first and second year that are lower than under previous agreements, but it also provides that in the third year of the agreement, a "snap-

back" provision will restore the musicians' compensation to pre-1991 levels. The cafeteria plan for benefits is a flexible plan created in accordance with Section 125 of the Internal Revenue Code, and it is maintained for the benefit of all the Symphony employees, including the musicians.

The Symphony has had financial difficulty since the early part of the 1980's, and at the time of its Chapter 11 petition, it had debts of approximately $1.745 million. The 1992 season opened with financial concerns which became more acute when the government grants, projected to account for 29 percent of the 1992–93 budget, were not forthcoming. Despite lobbying efforts on behalf of the Symphony, the funds eventually received from the state amounted to only $500,000.00 for 1992–93. The Symphony approached its lenders to attempt a debt restructuring, which they granted, reducing somewhat the total amount owed, requiring the Symphony to maintain a balanced budget, dictating what was to be done with the interest from the Foundation endowment, and effectively precluding further borrowing by the Symphony.

In 1992, the Symphony began attempts to scale back the compensation and benefits of the musicians, and in July 1992, a meeting was held to examine three proposals for reducing the number of musicians and/or the number of weeks of work. At subsequent meetings, other approaches were presented. Eventually, the musicians were presented with two proposals on September 10, 1992, each of which significantly reduced the musicians' pay and benefits. The musicians declined to vote on the proposals. When the Symphony found out that the musicians were not going to vote, the Symphony representative wrote the musicians a letter asking them to vote to approve one of the proposals, but they still did not.

The musicians did not receive their scheduled paychecks on September 15, 1992. Non-musician employees were paid. Nonetheless, the musicians decided to go forward with rehearsals and performances. They did, however, file a charge with the National Labor Relations Board, alleging that their

---

1. The facts are taken from pages 1–16 of the Memorandum Opinion [R. 258–273] of Judge

Tamara Mitchell, United States Bankruptcy Court for the Northern District of Alabama.

paychecks were withheld in retaliation for their acts in response to the Symphony's September 10 proposals. The musicians received their normal paycheck on September 30.

On January 9, 1993, the musicians were presented with a new proposal, still including significant cuts in the number of musicians as well as weeks played. The Symphony requested a response to the proposal by January 18, 1993. On January 12, 1993, the musicians voted to reject the January 9 proposal. The Symphony wrote the musicians asking reconsideration of the vote.

The musicians received only half of their regular paycheck on January 15, and they informed the Symphony that they would continue to work only if they received their full paychecks. They were waiting to see if full payment was forthcoming before deciding whether to play the scheduled (and completely sold-out) concerts featuring Emmylou Harris. However, apparently before the musicians had made their decision, they heard from the Civic Center stage hands that they had already been instructed to tear down the stage for the Harris concert. The musicians informed the Symphony late in the evening on January 18 that the musicians would not reconsider their January 12 vote.

The next day, the Symphony filed its Chapter 11 bankruptcy petition. After filing the petition, the Symphony presented other proposals, all of which the musicians rejected. They did, however, indicate a willingness to negotiate, conditioned on the Symphony's payment of salaries and reinstatement of benefits, all of which had ceased as of January 15, 1993. The Symphony and the musicians could not reach an agreement.

The Symphony petitioned the Bankruptcy Court for a rejection of the CBA, contending that any efforts to reorganize were effectively precluded by the CBA. In its opinion, filed on May 17, 1993, the court found that the Symphony was entitled to reject the CBA and to limit payments under its cafeteria plan.[2] The musicians appealed that decision to this court. On November 19, 1993, the

Bankruptcy Court entered an order converting the Chapter 11 case to a Chapter 7 case.

## STANDARD OF REVIEW

A bankruptcy court's findings of fact shall not be set aside unless they are clearly erroneous. FED. R. BANKR. P. 8013. A bankruptcy court's conclusions of law are subject to de novo review. *In re Holywell Corp.*, 913 F.2d 873, 879 (11th Cir.1990).

## DISCUSSION

This case presents two related issues: the petition to reject the CBA and the petition to return to the express terms of the cafeteria plan. The bankruptcy court granted both petitions. This court will first address the question of the propriety of allowing the Symphony to return to the express terms of the cafeteria plan.

In its Motion for Authority to Limit Cafeteria Plan Payments, the Symphony seeks permission to return to conformity with the express terms of the plan and to cease its voluntary compliance with the suggested Treasury Regulations, by which the Symphony says it made available to the musicians at the beginning of the year the entire amount that they were expected to contribute during the entire year.

The musicians have not argued and have not presented evidence that the change the Symphony sought is not a return to the original terms. The court notes the musicians' argument that the bankruptcy court is without authority to order permanent modifications to a CBA, but this court sees no evidence that is in fact what the Symphony sought concerning the cafeteria plan. To the contrary, it seems to have asked explicitly only for a return to the terms of the agreement. Therefore, to the extent that the Symphony seeks to discontinue its voluntary compliance with the suggested Treasury Regulations and comply with the terms of the cafeteria plan as originally agreed by the parties, the bankruptcy court's order is due to be affirmed.

---

**2.** Although the bankruptcy court's opinion grants the Symphony's Motion to Limit Cafeteria Payments, the record presently before this court does not indicate that the "limit" was anything other than a cessation of contributions and benefit payments.

■ The second issue in this case, the question of the propriety of allowing the Symphony to reject the CBA with the musicians, is more complex. The issue of rejecting a CBA in the context of bankruptcy has a somewhat convoluted history, as the bankruptcy judge thoroughly addressed her opinion. The question came before the Supreme Court in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), and was resolved in favor of the debtor, allowing rejection of the contract. 465 U.S. at 526, 104 S.Ct. at 1196. Congress, evidently keenly aware of the impact that the decision would have on members of unions across the country, reacted by enacting 11 U.S.C. § 1113 only a few months later. Since that time, two lines of interpretation have developed as the courts have applied the new law to the situation the court faced in *Bildisco*, and they appear to this court to be irreconcilable with each other. One line finds that a breach of contract is not a violation of § 1113(f);[3] the other line of cases finds that failure to perform the obligations prior to obtaining court permission to do so is a violation of § 1113(f).[4]

■ This court finds no clear error in the bankruptcy court's findings of fact. However, concerning the bankruptcy court's conclusions of law, this court finds persuasive the line of cases holding that a breach is of the CBA is a violation of § 1113(f), and is persuaded that allowing a rejection of the CBA is improper when the debtor has unilaterally ceased performing its obligations under the CBA prior to seeking court permission to modify or reject the CBA. The court notes that in the present case, the debtor apparently failed to perform in full its obligations under the CBA even prior to filing under Chapter 11 on January 19, 1993, as evidenced by its failure to pay the musicians the full amount of wages due on January 15, 1993.

## 11 U.S.C. § 1113

The process for rejecting a CBA is set out in 11 U.S.C. § 1113, whose history the bankruptcy court discussed thoroughly, and which this court need not repeat here. The subsection of most importance to the present case states that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. § 1113(f).

■ The drafters of § 1113,[5] however, were not as clear as they might have been,[6] and the interpretation of the law has not been consistent among the courts that have examined the section. As a question of law, the bankruptcy court's application of 11 U.S.C. § 1113(f) must be reviewed de novo. This court has found no controlling authority and has found a split in the courts that have addressed the question, centered on two lines of argument.

The different interpretations of this section are epitomized by *In re Moline Corp.*, 144 B.R. 75 (Bankr.N.D.Ill.1992) and *In re Armstrong Store Fixtures Corp.*, 135 B.R. 18 (Bankr.W.D.Penn.1992), *reconsideration denied*, 139 B.R. 347 (Bankr.W.D.Penn). *In re Moline*, which the bankruptcy court found

3. Rejection of a CBA would therefore continue to be appropriate.

4. Rejection of a CBA would then be inappropriate.

5. The legislative history of § 1113 is sparse. However, the remarks of some of the members are consistent in stating that the drafters wanted to avoid future cases similar to *Bildisco*. Mr. Dole stated that the new law "overturns the *[Bildisco]* court ruling with regard to unilateral rejection, and requires now a prior court hearing and ruling upon an application for rejection of a collective bargaining agreement." (130 Cong. Rec. § 8890 (June 29, 1984)). Mr. Morrison pointed out that the agreed language (of § 1113)

"moves us in the direction of a negotiation process rather than a litigation process to save companies that are in trouble without permitting any abuse of chapter 11 to vitiate improperly labor contracts." (130 Cong. Rec. H 7495 (June 29, 1984)). Mr. Lungren added that "a major part of this is that we no longer allow unilateral rejection. There is a process that must be gone through before that can be entertained. That is an abrogation of the contract, and that is a significant difference in the law prior to this time." (130 Cong. Rec. H 7496 (June 29, 1984)).

6. The court in *In re Moline Corp.*, 144 B.R. 75, 78 (Bankr.N.D.Ill.1992), for example, describes some of the language that perhaps represents "drafting errors" in the section.

persuasive, dealt with a debtor in possession which had failed to pay pre-petition debts incurred under a CBA although it had complied with the obligations of the CBA while operating as a debtor in possession. *Moline*, 144 B.R. at 76. The issue before the court was the priority to be accorded claims arising out of CBAs that have not been rejected, an issue different from that before the bankruptcy court in this case. However, the court's reasoning concerning § 1113 and rejection of the CBA is applicable to the present case.

▮ The court in *Moline* reasoned that until a trustee or debtor in possession[7] rejects a CBA, it must abide by the terms of the agreement. *Id.* at 78. The court added, however, that although a debtor who fails to make payments under the terms of the agreement may have breached the agreement, "the debtor has neither altered nor terminated the collective bargaining agreement. No term of the contract has been altered. No rights under the contract have been terminated. The contract is exactly the same collective bargaining agreement the parties entered into before the Chapter 11 case."*Id.* at 79. The court thus found that a breach of contract did not amount to a violation of § 1113(f). *Id.*

The court in *Armstrong*, which also addressed the issue of priority of claims in the case of a breach of contract, reached a different conclusion.[8] The *Armstrong* court faced a situation in which the debtor had failed to abide by the terms of a CBA with the employees, although the debtor had not at any time sought to alter or terminate its obligations under the CBA. *Armstrong*, 135 B.R. at 21. The court found that the debtor's failure to abide by the terms of the contract

constituted a unilateral alteration of the agreement in violation of § 1113(f): "Debtors effected a unilateral alteration of the agreements, for purposes of § 1113(f), when they failed to abide by the provisions pertaining to payment of wages and benefits." *Id.*

Thus, the court in *Moline* found that a breach of contract constituted a breach only, and did not amount to a termination or alteration of the CBA in violation of § 1113(f), while the *Armstrong* court found that a breach of contract prior to seeking rejection of that contract is a unilateral termination or alteration in violation of § 1113(f).

In the present case, as in *Bildisco*, the Symphony sought a self-help remedy in deciding to stop making payments of compensation and benefits prior to asking the bankruptcy court for relief from its obligations under the CBA. The Symphony never sought the permission of the court for interim relief as provided in § 1113(e), and did not at any time prior to requesting rejection of the CBA cure its ongoing failure to abide by the terms of the agreement.

If a debtor is free to breach the CBA without impairing its ability to reject the contract later, then § 1113 provides no incentive to abide by the terms of the CBA in the interim. This court finds persuasive the reasoning of the Second Circuit in *In re Ionosphere Clubs, Inc.*, 922 F.2d 984 (2d Cir. 1990), *cert. denied sub nom, Air Line Pilots Ass'n, Int'l, AFL–CIO v. Shugrue*, 502 U.S. 808, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991), concerning the scope and application of § 1113(f). Although the court's examination of § 1113(f) was in the context of the issue of the automatic stay provisions and questions of arbitration, it noted that the alterations in

---

7. As the court points out, while § 1113(a) binds the trustee or the debtor in possession in assuming or rejecting a CBA, § 1113(f) refers only to the trustee. *Moline*, 144 B.R. at 79 and n. 1. However, this court agrees with the *Moline* court that the two subsections are both intended to include the same people, that is, both the trustee and the debtor in possession. Any other reading of the section would allow the debtor in possession to do what is specifically forbidden for a trustee, a result that the drafters certainly cannot have intended absent explicit language authorizing such action.

8. Collier notes that "debtors remain obligated to pay wages and benefits in accordance with the collective bargaining agreements as they become due, and the failure to do so has been held to be a unilateral alteration of the agreement in violation of section 1113(f), not merely a breach of the agreement." 5 *Collier on Bankruptcy*, paragraph 1113.01 and note 34d (1994). Collier's citations are then to cases that have held that a breach is a violation of § 1113(f), with the exception of *Moline*, which is the only case he cites for the contrary proposition.

the law were made in response to *Bildisco,* in which a debtor refused to abide by its obligations under a CBA and withheld payment without negotiating with the union and prior to obtaining court permission to modify the CBA. The court noted further that the events in *Bildisco* could be said to represent the ills that Congress sought to cure by way of § 1113. *Ionosphere Clubs,* 922 F.2d at 990. The court concluded from the language of the statute, from statements of the sponsors of the legislation, and from the context of its enactment, "that Congress intended that a collective bargaining agreement remain in effect and that the collective bargaining process continue after the filing of a bankruptcy petition unless and until the debtor complies with the provisions of § 1113." *Id.* (citations omitted). Such a goal would not be possible without deterring the debtor from unilateral action, and preclusion of rejection seems clearly the deterrent that Congress envisioned.

Congressional intent to prevent the unilateral rejection of CBAs that occurred in *Bildisco* is accomplished only if a breach of contract is viewed as a violation of § 1113(f) preventing rejection of the contract. Any other reading means that the current law prescribes no different result in practice than that in *Bildisco* and thus provides no deterrent to breach. The practical result is that there would be no difference in the result under *Bildisco* and under § 1113, which Congress enacted to prevent a recurrence of the situation in *Bildisco.* Thus, the only logical reading of the law is that a breach prior to obtaining permission from the bankruptcy court to terminate or modify a CBA precludes its rejection.

In addition, the inclusion of the emergency modification provision in § 1113(e) would be meaningless if Congress intended the debtor to be able to breach an agreement with impunity, still able to petition successfully to reject it later. There is no reason to enact an emergency provision if the law allows the debtor to stop performing its obligations under the contract prior to court intervention. The inclusion of the emergency modification provision is strong evidence that Congress envisioned no possibility of self-help modifi-

cations prior to the bankruptcy court's consideration of the petition to reject the contract.

Thus, the court finds that 11 U.S.C. § 1113 precludes the rejection of the contract by the Symphony in this case, since it impermissibly stopped performing its obligations under the CBA prior to seeking court permission to do so. That breach of contract constituted a violation of § 1113(f), and the bankruptcy court's allowing the rejection after the Symphony had unilaterally stopped fulfilling its obligations under the CBA was improper.

## FAIR TREATMENT AND GOOD FAITH

The musicians assert as further grounds for this appeal that the bankruptcy court erred by finding compliance with § 1113's requirements that all parties be treated fairly and equitably and that the dealings be in good faith. This court has found that, as a matter of law, the Symphony should not have been allowed to reject the contract because of its violation of § 1113(f). For that reason, the court does not reach the issue of asserted error in the analysis of the fairness and good faith of the dealings between the parties.

## CONCLUSION

For the foregoing reasons, the court finds that the decision below allowing the Symphony to limit its payments under the cafeteria plan to payments in conformity with the express terms of the plan is due to be affirmed; the bankruptcy court's decision to allow the Symphony to reject the CBA with the Musicians is due to be reversed and vacated. An Order so directing will be entered with this Opinion.