**In re ELECTRICAL CONTRACTING SERVICES COMPANY, Debtor.**

**No. 03–26582 HRT.**

United States Bankruptcy Court,
D. Colorado.

Nov. 6, 2003.

Sherman & Howard, Denver, CO, Giovanni M. Ruscitti, Boulder, CO, for Debtor.

Joseph Rosania, Broomfield, CO, for Trustee.

Joanne C. Speirs, Denver, CO, for U.S. Trustee.

## ORDER

HOWARD R. TALLMAN, Bankruptcy Judge.

This matter comes before the Court on Debtor's Motion to Reject Collective Bargaining Agreement Pursuant to Section 1113(b)(1). The Court held a hearing on the motion over a series of days as the calendars of the Court and counsel for the parties permitted. The hearing began on the afternoon of October 7, 2003, and concluded with closing arguments presented on October 27, 2003. The Court is mindful of its obligation to rule on Debtor's application for rejection within 30 days of the October 7, 2003, commencement of the hearing of this matter. 11 U.S.C. § 1113(d)(2).

## DISCUSSION

 Debtor is a signatory to a collective bargaining agreement [the "CBA"] with Local 68 of the International Brotherhood of Electrical Workers [the "Union"]. As with other executory contracts, a debtor may accept or reject a collective bargaining agreement. Prior to codification of specific procedures for accomplishing rejection, the courts considered a motion to reject such an agreement under the provisions of 11 U.S.C. § 365. However, in the Bankruptcy Amendments and Federal Judgeship Act of 1984, Congress enacted 11 U.S.C. § 1113 which contains nine elements[1] that the Court must find in order to allow the Debtor to reject the CBA:

---

1. All of the nine recognized elements derive directly from the statute. Elements 1 through 4 are stated in § 1113(b)(1)(A); element 5 in § 1113(b)(1)(B); elements 6 and 7 in § 1113(b)(2); element 8 in § 1113(c)(2); and element 9 in § 1113(c)(3).

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

11 U.S.C. § 1113; *In re Salt Creek Freightways,* 47 B.R. 835, 838 (Bankr. D.Wyo.1985) (citing *In re American Provision Co.,* 44 B.R. 907, 909 (Bankr.D.Minn. 1984)). The Debtor bears the burden of proof. *National Forge Company v. Independent Union of National Forge Employees (In re National Forge Company),* 289 B.R. 803, 810 (Bankr.W.D.Pa.2003) ("As to each of the nine prerequisites for rejection of the CBA, Debtor bears the burden of proof."). The Court will address each of the nine elements in order.

**A. *Debtor Made a Proposal.***

This element is not contested. Duane Tidwell, Business Manager for the Union, acknowledged that a proposal had been made. In addition, Debtor introduced its August 18, 2003, letter into evidence proposing changes to the CBA and a series of e-mail communications between counsel for the Union and counsel for Debtor which reference and clarify Debtor's new proposal made at the October 3, 2003, meeting between the parties.

**B. *The Proposal Was Based on the Most Complete and Reliable Information Available.***

The testimony of Jim Bott, the 100% shareholder and president of the Debtor, confirmed that the proposal made to the Union was based upon his review of the Debtor's potential for profitability after he had made a number of changes in the Debtor's operations. He replaced the head estimator and his staff of estimators to address problems with the bidding process. He discontinued bonuses, 401(k) contributions, and health care coverage for inside employees. Mr. Bott's testimony was to the effect that, even after making those changes, his review of the Debtor's potential profitability indicated that further economics needed to be made and that the only part of the operation left to address was the company's cost of labor.

**C. *The Proposed Modifications Are Necessary to Permit Reorganization of the Debtor.***

The Union argues that Debtor's proposed modifications are not necessary due to a combination of factors: 1) that the Debtor's financial problems stem from mismanagement; 2) that the Debtor's proposal to change the journeyman/apprentice ratio is contrary to state law; and 3) the Union's expert witness testified that Debt-

or could be profitable without the modifications.

■ As to the illegality of one of the August 18 proposals, the evidence was contradictory. The Court credits the Debtor's evidence that the 5 to 1 ratio that appears in the letter is a typographical error and that it was intended to reflect the lawful ratio of 3 to 1. In any case, the fact that a proposal may contain a term that, if accepted by the Union, would violate labor laws neither violates § 1113(b)(1)(A) nor absolves the Union from its obligation to bargain over the proposals. *Sheet Metal Workers' International Ass'n v. Mile Hi Metal Systems, Inc. (In re Mile Hi Metal Systems, Inc.)*, 899 F.2d 887, 891 (10th Cir.1990).

■ Debtor acknowledges the management problems but also points out that declining economic conditions and a law suit on one of its larger jobs has drained the company resources. But this element of the test is less concerned with the company's history than with its fate going forward. That was most effectively addressed by the testimony of Mr. Bott and by Debtor's expert witness.

■ The Debtor presented expert testimony of James Vandegrift. Mr. Vandegrift's credentials and experience in the industry are impressive, yet his testimony was only marginally helpful to the Debtor as to the necessity element. The focus of this element should be a comparison of the ability of the Debtor to reorganize under its current CBA as compared to its ability to reorganize under the CBA as modified by Debtor's proposal. Unfortunately, the focus of Mr. Vandegrift's testimony was to compare Union labor rates under the CBA to prevailing non-union labor rates in the Denver metropolitan area. In addition, Mr. Vandegrift had never reviewed the Debtor's financial statements and could only speak in generalities with respect to this Debtor's operations.

■ Mr. Vandegrift's extensive experience in this industry did, however, allow him to testify authoritatively regarding the competitive conditions which exist in the marketplace in which this Debtor has decided to focus its efforts. The testimony of Mr. Bott was that the focus of the Debtor's reorganization effort is the market for service jobs and smaller bid jobs that average in the $100,000.00 to $150,000.00 range. He further testified that the Debtor required increased flexibility to set work hours and overtime policies because, when the Debtor does that type of work, it frequently needs to schedule its work around the needs and work schedule of its customers. Mr. Vandegrift testified that non-union employers predominate in that area of the industry. The proposal made by the Debtor included significant pay concessions, but it was primarily focused on the work scheduling and overtime issues necessary to give it the added flexibility to compete in its newly chosen marketplace.

The Union presented expert testimony from Mr. Jon Karraker with respect to his analysis of the Debtors financial performance and his opinions regarding the Debtor's potential profitability. The Court does not question Mr. Karraker's expertise as a CPA. However, the Court did find the focus of his analysis to be a bit off target with respect to the necessity element. Mr. Karraker's analysis focused on the Debtor's historical performance. With no industry specific experience or expertise, however, Mr. Karraker's opinion as to the Debtor's potential for profitability could not adequately take into account the changed conditions in the electrical contracting industry or the implication of the Debtor's change in focus to a different

marketplace than the one in which the Debtor has traditionally operated.

The Court heard and considered: 1) Mr. Bott's testimony regarding the change in Debtor's focus to service jobs and smaller bid jobs; 2) the testimony of Mr. Vandegrift concerning the competitive conditions in that segment of the market; 3) the testimony of Mr. Bott with respect to the significant changes he had made to the Debtor's operations; and 4) his unequivocal testimony that without the concessions requested from the Union the Debtor would be forced to liquidate. The Court also considered the testimony of the Union's expert to the effect that the Debtor could be profitable operating under the CBA.

After hearing and considering the somewhat conflicting evidence, the Court is persuaded that the proposed modifications to the CBA put forth by Debtor are necessary to permit Debtor's reorganization.

### D. All Affected Parties Are Treated Fairly by the Proposed Modifications.

 The purpose of this element is to insure that the "pain" of the Debtor's reorganization is spread equitably among all of the affected parties. A debtor will not be allowed to reject a union contract where it has demanded sacrifices of its union without shareholders, non-union employees and creditors also making sacrifices. In this case, the Court is satisfied that the proposed modifications are fair and equitable. In fact, in this case, the Union was the last party asked to make any sacrifice. Prior to filing its bankruptcy petition and making proposals to the Union to modify the CBA, Debtor had made substantial changes to the cost of its operations.

Jim and Judy Bott have placed a second mortgage on their personal residence and injected the cash obtained into the business. Mr. Bott has placed a mortgage against another piece of real property which he owns to obtain additional working capital for the business. Thus, approximately $700,000.00 was injected into the business for which the Botts are personally liable.

Bonuses and employer 401(k) contributions for inside employees were discontinued. Employer-paid medical coverage for inside employees was discontinued. The number of inside employees was reduced.

It appears to this Court that the Debtor made every effort to effect changes to its operation that would save it money and allow it to regain a competitive footing before it knocked on the Union's door to request concessions. The Debtor's actions in this regard satisfy the fairness element of the statute.

### E. The Debtor Provided the Union with Relevant Information Necessary to Evaluate the Proposal.

This element is not in dispute. During his testimony, Duane Tidwell acknowledged that the Union had been provided with the relevant information which it requested from the Debtor.

### F. Prior to the Hearing on Rejection of the CBA, the Debtor Met at Reasonable Times with the Union.

 The initial proposal was made to the Union on August 18, 2003. The hearing on rejection of the CBA commenced on October 7, 2003. The parties did not meet to discuss the Debtor's proposal until October 3, 2003. The Court certainly would have preferred to see serious bargaining between the parties commence prior to four days before the hearing began. However, the testimony makes it clear that the initial position of the Union was that the

proposal did not provide a basis for discussions and the Debtor's invitations to discuss the proposal were rebuffed by the Union until somewhat late in the process. Nonetheless, the parties did meet prior to commencement of the hearing. It is evident from the fact that new proposals were made at the October 3, 2003, meeting that it was a meeting of substance, even though it did not lead to an agreement on modifications. The Court finds that this element of the statute has been satisfied.

## G. *The Debtor Did Confer in Good Faith in Attempting to Reach Mutually Satisfactory Modifications.*

On August 18, 2003, Debtor's counsel wrote a letter to the Union proposing modifications to the CBA, citing 11 U.S.C. § 1113 and declaring its intention to file its bankruptcy petition on that date. The Debtor delayed its actual filing date until August 21, 2003. In his letter to Debtor's counsel dated August 18, 2003, the Union's counsel referenced the Union's agreement to refrain from immediately exercising its rights under § 2.04 of the CBA. That paragraph empowers the Union to withdraw its members from an employer's work sites when an employer is unwilling or unable to comply with certain requirements to assure future payments into the fringe benefit trust funds. On August 22, 2003, after learning of the bankruptcy filing, the Union did remove its members from Debtor's work sites.

Debtor could have responded in at least a couple of ways with respect to the Union's action. It could have asked the Court to examine whether or not the Union's action constituted a violation of the automatic stay. It could have asked for interim relief from the requirements of the CBA under § 1113(e). It chose, instead, a third alternative. It hired non-union re-placement workers to continue the work on its outstanding jobs.

The Debtor informed the Court of the removal of the Union's members from its work sites by way of its supplement to the motion to reject which it filed on August 26, 2003. That was also the date that the Court held a hearing on a number of the Debtor's "first day motions." At that time, Debtor's counsel requested that the § 1113 motion be held in abeyance and indicated that the Debtor intended to continue negotiating with the Union. The Union's counsel did not rise to contradict the statement that the parties intended to continue to negotiate their differences. The matter of replacement workers was not raised at that time and it is not clear to the Court exactly when the non-union replacements were hired.

The good faith requirement does not apply exclusively to debtors. *Mile Hi Metal Systems*, 899 F.2d at 892. A good faith negotiation cannot take place when only one party acts in good faith. The Court is hard-pressed to find good faith in the Union's decision to pull its members off of the Debtor's job sites immediately upon being informed of the filing of the bankruptcy petition. But, by the same token, this Court hardly condones Debtor's resort to self-help instead of taking advantage of the avenues that the Code provides to deal with situations such as the one the Debtor faced.

At least one court has taken the position that a motion to reject a collective bargaining agreement cannot be granted where a debtor has made unilateral modifications to the agreement in violation of § 1113(f) without first requesting interim relief under § 1113(e). *Birmingham Musicians' Protective Ass'n Local 256–733 v. Alabama Symphony Ass'n (In re Alabama Symphony Ass'n)*, 211 B.R. 65, 70 (N.D.Ala.1996). The Court has reviewed

that opinion with interest and appreciation for the analytical framework which it provides.

While the legislative history that exists with respect to § 1113 is of limited value, *Mile Hi Metal Systems*, 899 F.2d at 890, it is at least clear that § 1113 was enacted as a legislative reaction to the decision of the Supreme Court in *NLRB v. Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *Mile Hi Metal Systems*, 899 F.2d at 889. That decision had two components. It found that a debtor could reject a collective bargaining agreement under § 365(a) if the court found that the agreement burdened the debtor and if the balance of the equities favored rejection of the contract. *Bildisco*, 104 S.Ct. at 1196. It also found that, after the filing of the bankruptcy petition, the collective bargaining agreement is not enforceable until formal acceptance of the agreement by the debtor. *Bildisco*, 104 S.Ct. at 1199. Section 1113 codifies, and arguably heightens, the somewhat general standard for rejection enunciated in *Bildisco*. It also directly overrules the second component of the *Bildisco* decision which allows a debtor to resort to self help pending formal acceptance or rejection of the agreement. 11 U.S.C. § 1113(f).

It is with this history in mind that the *Alabama Symphony* court argues, with considerable force, that the debtor's resort to self help, without first requesting interim relief from the court, precluded granting the debtor's motion to reject the collective bargaining agreement.[2] But this Court is wary of *per se* rules. The myriad of circumstances which can arise in the process of reorganizing under the Bankruptcy Code and the equitable nature of the bankruptcy courts counsel in favor of retaining a modicum of flexibility for the courts and debtors to respond to unusual circumstances. Section 1113(f) does not prescribe any remedy for Debtor's failure to request interim relief. This Court believes it appropriate to treat the Debtor's purported unilateral modification as a factor to be considered in its good faith analysis as opposed to a *per se* disqualification from relief under § 1113. That approach allows the Court to retain the flexibility and discretion needed to fairly and equitably deal with circumstances such as those presented by this case. A single wrong move in exigent circumstances should not necessarily be fatal to a reorganization effort.

In the very infancy of this Debtor's reorganization, and apparently in response to the bankruptcy petition, the Union removed all of its members from the Debtor's jobs. Nobody can seriously argue that an electrical contractor without electricians stands a chance of reorganizing. It is in this context that the Debtor made its decision, without seeking interim relief from the Court under § 1113(e), to hire the non-union replacement electricians in order to continue work on its ongoing projects.

It was a bad decision.[3] The Code provides that the CBA remains in effect until

---

**2.** The district court noted that the cases of *In re Moline, Corp.*, 144 B.R. 75 (Bankr.N.D.Ill. 1992), and *In re Armstrong Store Fixtures Corp.*, 135 B.R. 18 (Bankr.W.D.Pa.1992), exemplify a split of authority on the subject of whether a post-petition breach of a collective bargaining agreement is a unilateral modification which violates § 1113(f). However, this Court takes only scant guidance from those cases. Both of those cases and the *Alabama Symphony* case involved failure to make post-petition payments into fringe benefit trust funds. The *Moline* and *Armstrong* cases centered on the payment priority of that post-petition arrearage. This Court views hiring of non-union replacements as a much more substantial departure from contract terms.

**3.** Debtor's counsel contended, during closing argument, that Debtor had the right under the

rejected. 11 U.S.C. § 1113(f). It also provides an avenue which the Debtor should have used to seek interim relief. 11 U.S.C. § 1113(c). The bankruptcy courts are organized in a manner to allow them to respond expeditiously to such urgent situations.

Yet the Court recognizes that the Debtor was faced with an extreme circumstance. It was a situation precipitated by the Union's act of pulling its members from the job sites. Failure to continue work on its projects undoubtedly meant certain and sudden economic death.

The Court's review of all of the other relevant factors convinces it that rejection of the CBA is otherwise in order in this case. The Court does not believe that this Debtor can function in the marketplace in which it is seeking to operate if it continues to be burdened by the current CBA. Thus, the Court believes that its refusal to allow rejection of the CBA would sound the death knell to this Debtor's incipient reorganization attempt. The Court is mindful of the overarching purpose of chapter 11 to give the Debtor an opportunity to reorganize its financial affairs, *Bildisco*, 465 U.S. 513 at 527, 104 S.Ct. at 1196, and of the employees and creditors who will suffer if the Debtor ceases its operations. Thus, even as the Court must condemn, in the strongest terms, the Debtor's failure to seek interim relief, it will not, in these unique circumstances, invoke the death penalty on account of that failure.

The Court acknowledges that it is a close question. On balance, however, the Court finds that the Debtor acted in good faith. It met with the Union on October 3, 2003. When the Union made it clear that it was rejecting the proposed modifications contained in the Debtor's August 18 letter, the Debtor offered proposals more favorable to the Union. Those actions bespeak of a Debtor which is trying come to an accommodation with the Union notwithstanding the Union's withdrawing of its members and the Debtor's hiring of replacements. The evidence convinces the Court that the Debtor made an effort at negotiating the modifications. It could not have escaped the Debtor, as it negotiated, that it would have to fire the replacements and rehire the Union workers if the negotiations were successful. The Court believes that the Debtor took what it viewed as a temporary action to give it some chance at survival while it continued to negotiate with the Union over its proposed modifications.

**H. *The Union Rejected the Proposal Without Good Cause.***

▮ It was the testimony of Duane Tidwell that the Debtor's proposal was rejected by the Union primarily due to a

---

CBA to hire replacement workers after the Union pulled its members off of the Debtor's work sites. Counsel did not direct the Court to any portion of the CBA as support for this authority. The Union's correspondence to Debtor's counsel cited § 2.04 of the CBA as authority for its actions. That section specifically provides that the CBA remains in effect. Article I of the CBA sets out procedures for adjusting grievances and disputes under the CBA. The Court has failed to locate the contract language relied on by Debtor's counsel for the contention that Debtor acted within its rights under the CBA but, instead, the language the Court has located in the CBA appears to be in contradiction to that contention. The Court does not purport to decide whether or not the Union was properly entitled to act under § 2.04 of the CBA. The most the Court can find from the evidence before it is that the Union has made reference to a specific section of the CBA in support of its action and the Court is unable to find support in the CBA for the reciprocal action taken by the Debtor. Thus, it appears to the Court that Debtor effected a unilateral termination of the CBA prior to obtaining authority from the Court.

clause in the CBA known as the Favored Nations Clause. Section 2.05 of the CBA provides that

> The Union agrees that if, during the life of this Agreement, it grants to any other Employer in the Electrical Contracting Industry on work covered by this Agreement, any better terms or conditions than those set forth in this Agreement, such better terms or conditions shall be made available to the Employer under his Agreement and the Union shall immediately notify the Employer of any such concession.

In short, in accordance with the CBA, if the Union granted a modification to Debtor, then 1) it would have to notify all of the other employers who are covered under the CBA of the modification that was granted to the Debtor; and 2) it would have to offer the same terms to all of the other covered employers. The Union argues that giving terms to all other employers similar to what Debtor asked for would drastically affect the Union and its members, so it could not give its assent to the proposed modifications.

However, as an alternative, the Union offered an adjustment under its Market Recovery Program ["MRP"]. MRP is a program, outside of the CBA, under which employers who are competing against non-union contractors on a particular bid job may request a type of subsidy from the Union which has the practical effect of reducing the hourly wage that the employer pays its union employees for that particular job. The Union offered a $6.00 per hour MRP adjustment to the Debtor instead of any modification to the CBA.

The Debtor urges that the Union presented no evidence, beyond the speculation of its business manager, that any other employer would want to take advantage of the Favored Nations Clause if it granted modifications to the Debtor. However, the Court will indulge the inference that if the Union allowed the Debtor to cut wages and allowed it the work scheduling and overtime concessions which it sought, then many if not all of the remaining covered employers would invoke their rights under the Favored Nations Clause. Thus, it is clear to the Court that the Union found itself facing the dilemma that any significant concession granted to the Debtor would certainly be demanded by other covered employers.

But this element has consistently been interpreted as applying solely to the relationship between the Debtor and the Union and not to encompass the Union's relationship to any of its other employers. Thus, the Court appreciates the fact that a union operating under a collective bargaining agreement containing such a Favored Nations Clause can rarely accept meaningful modifications to the agreement, but at the same time, the Favored Nations Clause cannot provide good cause for rejection of proposals under § 1113.

The Court has no basis to know how common such clauses are in collective bargaining agreements. What is clear is that if a bankruptcy court interprets the good cause element broadly enough to consider a union's relationship to all other employers covered by an agreement, then such a union automatically would have cause to reject any meaningful modification whenever a Favored Nations Clause is present. Thus, in those cases, § 1113 would become a nullity.

The Court agrees with the decision of Judge Sidney Brooks in *In re Sierra Steel Corp.*, 88 B.R. 337, 340–41 (Bankr.D.Colo. 1988), that "good cause" cannot be based on a consideration of the effect of the Favored Nations Clause on all signatories to the CBA. Since the Union did not articulate any other "cause" for rejection of the Debtor's proposals, the Court concludes

that the Union lacked good cause to reject Debtor's proposals.

## I. *The Balance of the Equities Clearly Favors Rejection of the Collective Bargaining Agreement.*

The *Bildisco* court articulated factors that the bankruptcy court should examine to determine whether or not a balance of the equities favors rejection of a collective bargaining agreement. Those factors survive the enactment of § 1113. *Mile Hi Metal Systems, Inc.*, 899 F.2d at 890 n. 2. The factors are:

the likelihood and consequences of liquidation for the debtor absent rejection, [2] the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and [3] the impact of rejection on employees. In striking the balance, the court must consider not only the degree of hardship faced by each party, but also any qualitative difference between the types of hardship each may face. . . . [T]he bankruptcy court must focus on the ultimate goal of Chapter 11 when considering these equities.

*Bildisco*, 465 U.S. 513 at 527, 104 S.Ct. at 1196–97.

The evidence as to the likelihood of liquidation was somewhat contradictory. Mr. Bott testified unequivocally that Debtor would be forced to liquidate if it could not reject the Union contract. The Union's expert witness, Mr. Karraker, testified that debtor could be profitable under union contract. The Court would have given greater credit to Mr. Karraker's opinion but for the fact that it was based solely upon the Debtor's historical performance in a marketplace different from the one it has chosen for the focus of its reorganization efforts. For example, such an analysis does not take into account jobs which the Debtor could have gotten if it had the cost structure and flexibility to compete effectively in that market niche. The Court also had to take into account Mr. Karraker's lack of exposure to the current market conditions of the electrical contracting industry. The evidence persuades the Court that the marketplace for service jobs and smaller bid jobs is different enough from the market that the Debtor has historically operated in that it must give greater credit to Mr. Bott and Debtor's expert witness on that point. The Court, therefore, finds that the likelihood of liquidation is high if the Debtor is not allowed to reject the CBA.

Neither party produced evidence on the question of the effect on the creditors generally. However, the Union did present testimony as to the ERISA withdrawal liability to the fringe benefit trust funds that would accrue upon Debtor's rejection of the CBA and consequent withdrawal from the multiemployer group. The witness estimated that the withdrawal liability would total approximately $1,052,088.78. If the Debtor is permitted to reject the CBA, that debt will have to receive treatment in its reorganization plan. The Court has found that the effect of not allowing the Debtor to reject the CBA would most likely be liquidation. Accordingly, under those circumstances, that debt would be paid, if at all, in a liquidating plan or by a chapter 7 trustee. The trust fund entities will be no better off if the Debtor liquidates as opposed to having the withdrawal liability paid through the reorganization plan of a going concern.

Finally, rejection will have no impact on the union employees. The evidence is that the Union has pulled its members from Debtor's job sites. Certainly, non-union employees will lose their employment if the Debtor is forced to liquidate.

Absent rejection, the Debtor is likely to liquidate. The Court has considered the effect of an order disallowing rejection on the interested parties. It has weighed in the fact that the Union has already chosen to pull its members from the Debtor's jobs. When the Court focuses, as it must, on the ultimate goal of chapter 11 to foster successful reorganization, it finds that the equities clearly favor rejection of the CBA.

## CONCLUSION

The Debtor made its motion seeking rejection of the CBA pursuant to 11 U.S.C. § 1113 upon the filing of its bankruptcy petition on August 21, 2003. In light of the evidence and arguments of counsel presented to the Court at the hearing on the motion, the Court has considered the nine requirements for rejection under § 1113. The Court finds that the Debtor has fulfilled its duties under 11 U.S.C. § 1113(b) and, in accordance with 11 U.S.C. § 1113(c), the Court finds that the Union has rejected Debtor's proposals for modification without good cause and that the balance of the equities clearly favor rejection of the agreement. Therefore, it is

**ORDERED** that Debtor's Motion to Reject Collective Bargaining Agreement Pursuant to Section 1113(b)(1) is hereby GRANTED. Debtor's collective bargaining agreement with Local 68 of the International Brotherhood of Electrical Workers is hereby rejected, effective this date.