In re WORLD SALES, INC., Debtor.

TEAMSTERS INDUSTRIAL SECURITY
FUND, Appellant,

v.

WORLD SALES, INC., Appellee.

BAP No. CC–94–1110–VJK.
Bankruptcy No. LA 92–48070 AA.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Feb. 22, 1995.

Decided June 15, 1995.

J. David Sackman, Julius Mel Reich, Los Angeles, CA, for appellant.

Daniel J. McCarthy, Los Angeles, CA, for appellee.

Before VOLINN, JONES and KLEIN,[1] Bankruptcy Judges.

## OPINION

VOLINN, Bankruptcy Judge:

### OVERVIEW

The debtor filed a chapter 11 petition and ceased business operations eighteen days later. The employees' benefit plan sought administrative priority payment for the debtor's monthly contribution to its employees' health plan and damages due on default under the terms of the debtor's unrejected collective bargaining agreement and ERISA. The court allowed only 18/31 of the monthly contribution as an administrative expense, allowed the remainder of the contribution and damages as a general unsecured claim, and disallowed a request for attorneys' fees. The creditor appeals.

### FACTS AND PROCEDURAL BACKGROUND

Appellant is the Teamsters Industrial Benefit Fund ("the Fund"), an employee benefit plan as defined in the Employee Retirement Income and Security Act of 1974 (ERISA) §§ 3(3) and (37), 29 U.S.C.A. §§ 1002(3) and (37). The debtor and appellee, is World Sales, Inc. ("World Sales"). The debtor, as employer, was party to a collective bargaining agreement ("the CBA") with the General Warehousemen Union, Local 598, International Brotherhood of Teamsters, AFL–CIO ("the Union").[2]

The Fund acted as trustee, receiving contributions for health and welfare benefits and purchasing health insurance for qualified employees. Pursuant to the CBA, World Sales agreed to contribute to the Fund a specified amount per calendar month—$340—"for each employee that works one day or more in any calendar month."[3]

As required by the CBA in furtherance of providing these employee benefits, World Sales executed an "Agreement and Declaration of Trust" ("the trust agreement"). Pursuant to the trust agreement, World Sales agreed to pay as liquidated damages 10 percent of any delinquent contributions, 14 percent interest on the balance due, and attorneys' fees incurred by the Fund in a suit to collect the delinquent amount.

The CBA and the trust agreement were in effect when World Sales filed a chapter 11 petition on Friday, October 2, 1992, the second working day of the month. Eighteen days later, on October 20, World Sales laid off its employees and sold its operation to a third party. World Sales never sought to modify or reject the CBA. During this final month, 57 employees otherwise qualified to receive health benefits worked at least one

---

1. The Honorable Christopher M. Klein, Bankruptcy Judge for the Eastern District of California, sitting by designation.

2. The CBA names as employer "M & N Services Company, Inc." An ancillary trust agreement refers to the employer as "World Distribution Systems." The parties do not explain whether World Sales, Inc. is an alias or DBA or in what manner it became substituted as the obligated employer.

3. The relevant text of Article XV of the CBA states:

> The employer agrees to continue to pay into the Teamsters Industrial Security Fund the sum of Three Hundred and Thirty–Five Dollars ($335.00) [sic] per month for each regular eligible employee, and for new employees in the unit after their thirty (30) day probationary period on the first day of the month after they have completed such 30 day probationary period, and thereafter continue to pay the monthly contribution for each employee that works one day or more in any calendar month. The purpose of this payment is to provide insurance and medical benefits, and vision care for such regular employees and/or their dependents.

day.[4] Although it remained in business, continuing to utilize the services of its employees for a substantial portion of the month, World Sales did not make any payment on the monthly contribution due for the health coverage of these 57 employees in October 1992.

Five months later, in March 1993, the Fund filed a proof of administrative claim for $100,300, alleging that World Sales had failed to pay five monthly contributions of $20,060 per month or to report to the Fund from October 1992 through February 1993. (The Fund later reduced its demand for delinquent contributions to $19,380, based on $340 for each of the 57 employees working during the single month of October).

On November 12, 1993, alleging that its demand for payment had been refused, the Fund filed a motion to compel immediate payment of delinquent contributions as postpetition employee benefits under 11 U.S.C. §§ 503(b)(1)(A).[5] The motion also claimed as an administrative expense: 1) liquidated damages of $1,938, 2) interest of $2,939.30, and 3) attorneys' fees in an unspecified amount to be proved by declaration subsequent to the hearing date. The Fund alleged that these additional damages were due pursuant to the debtor's obligations under the terms of the unrejected CBA and the trust agreement, and under ERISA § 502(g)(2), 29 U.S.C. § 1132(g)(2).[6] The Fund also alleged

that the debtor's failure to pay the delinquent contribution resulted in a lapse in employee health coverage and required immediate payment to alleviate the consequent hardship for the employees.

The debtor opposed the motion, alleging that it refused the Fund's demand because the Fund refused to accept less than the original $100,300 claimed. There is no indication in the record that the debtor tendered the final payment in any amount. The debtor argued against immediate payment. Noting that the lapse in employee health coverage had occurred over one year prior to the motion, the debtor disputed that there existed an emergency to cure and asserted that the Fund would be paid out of distributions under its chapter 11 plan. The debtor argued that the Fund's motivation for the motion was solely to avoid making "out-of-pocket" payments for health coverage. Finally, the debtor contended that the Fund was not entitled to a full monthly contribution because the employees worked only 18 days post-petition. Resisting the Fund's claim for additional damages, the debtor argued that its monthly obligation should be prorated and the total claim reduced accordingly.

At the hearing, the court denied the motion to compel immediate payment, and this ruling has not been pursued on appeal. The court allowed the claim for the full monthly

---

4. The parties have not provided us with a tally of employees, if any, who worked only on the single prepetition workday in October, or those who worked only post-petition, or both before filing and post-petition. Hypothetically, such distinctions could lead to or require results different than those we will reach here. Under the particular circumstances of this appeal, these distinctions are not material.

5. "After notice and a hearing, there shall be allowed administrative expenses ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case...."
11 U.S.C. § 503(b)(1)(A).

6. The relevant text of 29 U.S.C. § 1132(g) states:

(1) In any action under this subchapter ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—
(A) the unpaid contributions,
(B) interest on the unpaid contributions,
(C) an amount equal to the greater of—
(i) interest on the unpaid contributions, or
(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
(E) such other legal or equitable relief as the court deems appropriate.
For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.
29 U.S.C. § 1132(g).

contribution, liquidated damages, and interest.[7] However, the court allowed an administrative expense priority to only 18/31 of the contribution due, allowing the balance as a general or nonpriority unsecured claim.

## ISSUE PRESENTED

As noted above, this appeal arises from the Fund's motion to compel immediate payment of delinquent contributions and the debtor's objection not only to immediate payment, but to the total amount claimed. Neither party is pursuing these positions on appeal. The issue presented focuses solely on the priority to be afforded to the $19,380 claim for the month of October 1992: whether a claim may be prorated between general and administrative priority when the entire claim is based on payments due in collective bargaining provisions for post-petition work, and whether ancillary damages arising out of the post-petition breach of an unrejected CBA are entitled to priority as an administrative expense.[8]

## STANDARD OF REVIEW

■ The bankruptcy court's allowance or disallowance of administrative claims and assignment of priority to claims is reviewed for an abuse of discretion. *In re Dant & Russell, Inc.*, 853 F.2d 700, 707 (9th Cir. 1988); *In re Palau Corp.*, 139 B.R. 942, 944 (9th Cir. BAP 1992). A court abuses its discretion if it bases its decision on an erroneous view of the law or on clearly erroneous factual findings. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

## DISCUSSION

■ The trial court did not enter written findings and conclusions, nor state its analysis orally at the hearing. While the comment of the court is not fully illuminating—"I'm not changing the contract"—we infer from its conclusion that the court based its proration on § 503(b)(1)(A), which allows as an administrative expense only claims for services rendered post-petition that reflect "the actual, necessary costs and expenses of preserving the estate...." In any event, this is the position taken by appellee on appeal.

The question of the nature and extent to which a bankruptcy estate may be held responsible for post-bankruptcy obligations arises in varied contexts, e.g., taxation, leases, employment contracts, and violations of regulatory laws, such as CERCLA.[9] As will appear below, while there has been an effort to provide consistency, the result falls short of a bright-line standard.

■ Compensation for post-bankruptcy claims is generally entitled to priority over pre-bankruptcy claimants. Thus, administrative expenses allowed under § 503(b) are entitled to first priority in payment under § 507(a)(1). Priority is given to administrative expenses and costs incurred to encourage general creditors to provide goods and services to the debtor that are necessary to the orderly administration of the estate. *In re Palau*, 139 B.R. 942, 944 (9th Cir. BAP 1992). To this end, the terms "actual" and "necessary" are construed narrowly, and claims for administrative priority must preserve the estate for the benefit of creditors. *In re Dant & Russell*, 853 F.2d 700, 706 (9th Cir.1988).

While the trial court's conclusion focuses on the benefit to the estate, it relies on a premise that appears to be at odds with the evidence, viz., that the debtor did not receive full consideration post-petition in return for a full monthly contribution. The ruling depends on a perception that under the CBA, the employer's monthly benefits contribution

---

7. The court denied the Fund's request for attorneys' fees, citing a lack of supporting evidence. It is unclear whether the court's ruling was with or without prejudice.

8. We note that the fourth priority under § 507(a) encompasses "allowed unsecured claims for contributions to an employee benefit plan." On the facts here, the fund would be entitled to assert such priority. The parties agree that given such

priority, there are sufficient assets to pay appellant's entire claim. However, the parties staked their positions on administrative priority, and in either event, the issue of prorating remains in contention.

9. Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C.A. §§ 9601–9675 (West 1988 and Supp. 1992).

is a function of the hourly rate of work paid to employees. However, this premise is not supported by the sections of the CBA dealing with benefits and hourly pay, "Article XV—Triple Choice Health and Welfare," compared with "Article XIII—Holidays" or "Article VI—Minimum Guarantee." Article VI guarantees payment for eight hours of work to an employee who reports for work on time when called to work by the employer. In the event the employee reports to work late, quits, or is discharged for just cause during the shift, the employee is entitled to payment only for those hours actually worked. Barring such circumstances, however, the CBA entitles qualified employees to a full day's wage for short shifts. Under Article XIII, qualified employees who work regular work days before and after a holiday are entitled to payment for eight hours of work on the holiday. A comparison of these sections suggests that the parties considered the correlation of employee compensation to services rendered under a variety of circumstances.

Health plan payments were made in units of one month under the CBA. Article XV, however, explicitly states that the employer shall pay the "monthly contribution for each employee that works one day or more in any calendar month." These contract terms, under 11 U.S.C. § 1113(f), bound the debtor until rejection of the contract. Moreover, unlike wages, which can be adjusted in hourly units, the commercially reasonable unit of health insurance is monthly coverage. The CBA provided for such a monthly unit. The parties agreed and intended that a single day of work entitled an employee to monthly benefit. Under the contract, the actual cost to the estate for a single day of post-petition employment was a full month's contribution. That the payment would benefit an employee who worked less than an entire month would not lessen the obligation of the employer to pay the promised monthly contribution benefit of a compensation package provided such employee.

The foregoing reasoning was applied in *In re Tucson Yellow Cab Co., Inc.*, 789 F.2d 701

(9th Cir.1986). In that case, cabdrivers were laid off without notice upon the debtor's post-petition sale of the business. Under their rejected CBA,[10] the employees were entitled to two weeks severance pay in the event they were terminated with less than a two week notice of termination. Obviously, severance pay, while compensatory, does not involve services. Nevertheless, the Court of Appeals declared that the employees' post-petition services prior to termination were of benefit to the estate and that the rejected contract terms were evidence of quantum meruit for those services.

In *Tucson Yellow Cab*, the court determined that the employees worked in the "reasonable belief" that their wages remained unchanged, including severance pay. By awarding administrative status to the severance pay, the only general creditor, a personal injury judgment creditor, was denied satisfaction of her claim. The court ruled that the bankruptcy court's equitable jurisdiction to adjust the priority of claims to aid what it admitted was a well-deserving creditor was nonetheless limited by statute. "[Equitable principles] necessarily operate within boundaries set by statute." *Id.* at 704. Therefore, the drivers' claim for severance pay was entitled to administrative expense status as a post-petition obligation.

The debtor attempts to distinguish *Tucson Yellow Cab* by noting that it is not an apportionment case. This contention assumes that apportionment of the health benefit payment is the principal issue here. However, we view the primary issue as the application of § 1113(f) to the meaning of the terms of the CBA. It is the contract that spelled out the obligations of the debtor for one thing. For another, contributions to the fund were not measured on an hourly basis.

We think *Tucson Yellow Cab* instructive in this situation. In that case, the Ninth Circuit held that while termination of the drivers without full notice clearly did not benefit the estate, nevertheless, the drivers' post-petition employment under the contract constituted a benefit to the estate for which it

**10.** The CBA was rejected solely under § 365 with approval of the bankruptcy court in 1982, which predated enactment of § 1113.

became liable, and that compensation for the benefit should be afforded administrative priority.

The teaching of *Tucson Yellow Cab*, then, is that we must look not only to the benefit to the estate, but also to the consideration due the creditor for providing such benefit. Such consideration must encompass the entire bargain between the parties, including performance due upon foreseen and bargained for contingencies, such as lack of notice of termination in *Tucson Yellow Cab* and a shortened work-month in the instant case. Where the performance for which such compensation is due accrues post-petition, the payment owing by the estate must be afforded administrative priority.

The debtor relies on *In re Roth American, Inc.*, 975 F.2d 949 (3rd Cir.1992), where wages were earned prepetition and postpetition, which affirmed a bankruptcy court decision restricting administrative priority to employees' claims for severance and vacation pay under a CBA to only that portion earned post-petition and classifying as third priority under § 507(a)(3) that portion earned within 90 days of bankruptcy, with residual amounts classified as general unsecured claims. In *Roth American*, the union argued that because the debtor had not rejected the CBA under § 1113, § 1113(f) [11] mandated that the terms of the unrejected CBA governed all unpaid wages which would then be entitled to administrative priority. The court rejected this analysis, holding that § 1113(f) does not create an administrative priority for all claims arising out of an unrejected CBA, pointing out that refusal to allow a pre-bankruptcy claim first priority does not constitute unilateral termination of the CBA. *Roth American* at 954–55. The court concluded that § 1113 affords the procedure for rejecting a CBA and does not *per se* alter the priority scheme of § 507. *Id.* at 957.

The debtor also relies on *In re Palau*, 139 B.R. 942 (9th Cir. BAP 1992), which denied administrative priority to a post-petition claim for backpay due an employee who had successfully sued for wrongful termination before the National Labor Relations Board which granted him a backpay award. *Palau* did not involve a CBA nor an interpretation of § 1113. The employee in *Palau* performed no work post-petition. The backpay award did not benefit the bankruptcy estate. The BAP affirmed general unsecured status for the claim, noting that the employee was terminated prepetition. The BAP concluded that cases such as *Reading Co. v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed.2d 751 (1968) and *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir.1985), which impose administrative obligations on a debtor for post-petition torts and regulatory violations were inapposite; that § 503(b)(1)(A), which deals expressly with wage claims, governed the priority of claims relating to wages, particularly where they accrued pre-bankruptcy. *Palau* at 945.

Both *Roth American* and *Palau* are distinguishable from the instant case on their facts. In *Roth American*, the vacation and severance pay at issue had been earned both before and after the filing of the petition, and therefore, division of the claims was appropriate. The court allowed administrative priority for claims based on post-bankruptcy work. In *Palau*, the employee's wrongful discharge occurred prepetition, and the claim for backpay was therefore attributable to that period of time. Neither case precludes granting full administrative status for the monthly contribution at issue, since, as discussed above, the contribution came due because of work actually performed after bankruptcy thereby requiring the monthly payment in Article XV of the CBA.

The debtor analogizes to cases where rent is due the debtor's lessor and the debtor rejects the lease after using the premises post-petition for less than the monthly rent term. The debtor points to a Ninth Circuit case decided under the former Bankruptcy Act, *In re Frederick Meats, Inc.*, 483 F.2d 951 (9th Cir.1973), in which the bankrupt's landlord was entitled to only the reasonable value of the debtor's post-petition possession of the premises after the debtor rejected the

---

11. "No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section."
11 U.S.C. § 1113(f).

lease rather than the full contract terms of the lease. The debtor also cites *In re Gamma Fishing Co., Inc.*, 70 B.R. 949 (Bankr. S.D.Cal.1987), which analogized insurance premiums to rent and prorated the premium due under contract between administrative and general unsecured status pending assumption or rejection of the contract.

The analogy fails to recognize that § 1113(f) of the Code preserves post-bankruptcy claims arising under an unrejected CBA. Such treatment differs qualitatively from claims arising from rejection of executory contracts such as leases and insurance contracts. Section 365(g) deems rejection to constitute a breach of the contract as of the day before filing, thus allowing damages for the breach to be assigned general unsecured status. In the case of a CBA, however, the contract may not be rejected without first complying with the procedure set by § 1113, which was designed to prevent a debtor's precipitous unilateral breach of the CBA.

■ Section 1113 was enacted to protect employees during the interim between the filing of the bankruptcy petition and court-supervised modification or ultimate rejection of the CBA. During this period, working employees benefit the estate. Their rights accrue as services are rendered on the basis provided for by the CBA. These rights vest post-petition, and as indicated it would violate § 1113(f) to transform these rights into general unsecured claims upon subsequent rejection of the CBA. Hence, employees working under a CBA are insulated from the consequences of immediate rejection under § 365(g); subsection 1113(f) mandates that any conflict between § 1113 and other code sections must be resolved in favor of § 1113 as a whole. Because a CBA may not be rejected retroactively, unilateral breaches prior to rejection cannot be relegated to unsecured status. *In re Hoffman Bros. Packing Co., Inc.*, 173 B.R. 177 (9th Cir. BAP 1994). We therefore hold that a debtor's unperformed post-petition obligations under an unmodified or unrejected CBA are beyond the scope of § 365(g), and claims based on such post-petition breaches must be given administrative status, even where the CBA is

subsequently modified or rejected pursuant to § 1113.

In any event, here, as in *Tucson Yellow Cab*, World Sales' employees continued employment post-petition in the "reasonable belief" of a full month's health coverage for one day worked, and moreover, under the unrejected CBA, they had a contractual right to such coverage.

■ As to the issues relative to ancillary damages incurred by the debtor under the CBA and ERISA—liquidated damages, interest, and attorneys fees—which accrued based on the debtor's post-petition conduct, it appears that appellant should recover same. The terms of the CBA imposed on the debtor certain obligations if contributions were not timely paid. These obligations were incurred post-petition.

As noted, it is unclear whether the court denied the Fund's request for attorneys' fees with or without prejudice, and the issue is not fully ripe for review. The attorneys' fees sought by appellant are provided for in the CBA and trust agreement. These fees are mandatory under ERISA 29 U.S.C. § 1132(g)(2)(D), in a reasonable amount as determined by the court. The panel has previously ruled that reasonable attorneys' fees are available to lessors in litigation with the debtor over a lease. *In re Bullock*, 17 B.R. 438, 439 (9th Cir. BAP 1982) (purpose of attorney fee clause is to indemnify lessor against legal expenses incurred by reason of the other party's default). On remand the court should determine and assess a reasonable amount for these fees as well as calculate and allow interest on all past due sums from the date of accrual.

## CONCLUSION

The debtor concedes that the 18 days of work provided by the employees post-petition preserved the estate. According to the unmodified and unrejected CBA, the actual and necessary cost for these services included a full month's contribution for each employee regardless of the number of days worked during the month of October 1992, together with interest and a reasonable at-

torney fee for appellant's effort at the trial and appellate levels.

The order on appeal is VACATED and the case REMANDED for further proceedings in accordance with the above.