**In re COLORADO SPRINGS SYMPHONY ORCHESTRA ASSOCIATION, Debtor.**

**No. 03–10421 HRT.**

United States Bankruptcy Court, D. Colorado.

April 8, 2004.

---

**44.** *Alderete*, 289 B.R. at 419 (quoting *Hollister v. Univ. of N.D. (In re Hollister)*, 247 B.R. 485, 491–92 (Bankr.W.D.Okla.2000)).

Ronald M. Martin, Holland & Hart, LLP, Colorado Springs, CO, for the Colorado Springs Symphony Orchestra Association.

Virginia M. Dalton, Philip A. Pearlman, Dalton & Pearlman, Denver, CO, for M. Stephen Peters, the Chapter 7 Trustee.

Brent R. Cohen, Rothgerber, Johnson & Lyons, LLP, Denver, CO, for Pikes Peak Musicians Association.

Harrie F. Lewis, Lindquist & Vennum P.L.L.P., Denver, CO, for CSSO Foundation, Inc.

### ORDER RE: APPLICATION OF THE PIKES PEAK MUSICIANS ASSOCIATION FOR THE APPROVAL AND PAYMENT OF ADMINISTRATIVE EXPENSE

HOWARD R. TALLMAN, Bankruptcy Judge.

This case comes before the Court on the Application of the Pikes Peak Musicians Association for the Approval and Payment of Administrative Expense [the "Motion"] and on Trustee's Objection to Application of the Pikes Peak Musicians Association for Approval of Administrative Expense filed by M. Stephen Peters, the chapter 7 trustee [the "Trustee"]. Both the Debtor and CSSO Foundation, Inc., have joined in the Trustee's objection.

On February 2, 2004, the Court conducted a trial of the issues raised by the Motion. The Court has considered the evidence presented to it in conjunction with the legal arguments advanced by the parties' very able counsel and the Court is ready to rule on the Motion.

On January 10, 2003 [the "Petition Date"], the Debtor, Colorado Springs Symphony Orchestra Association [ "CSSO"], filed its voluntary petition under chapter 11. Shortly thereafter, on January 21, 2003, it filed a motion, pursuant to 11 U.S.C. § 1113, to reject its collective bargaining agreement [the "CSSO CBA"] with the Pikes Peak Musicians Association [the "Association"]. The CSSO CBA was in force on the petition date and would have expired on August 31, 2003. The CSSO CBA is somewhat analogous to a "minimum quantity contract" in that Association members are guaranteed payment under the CSSO CBA for a minimum number of services regardless of whether services are actually used by CSSO. In fact, no Association member participated in rehearsals or performances for the Debtor-in–Possession after the Petition Date, because CSSO cancelled several concerts. On February 13, 2003, the Court approved CSSO's application to reject the CSSO CBA and on March 12, 2003, this case was converted from chapter 11 to chapter 7. M. Stephen Peters was appointed as the chapter 7 trustee.

The issue that the Court must consider is whether wages and benefits which are contractually due to the Association members under the CSSO CBA are payable as an administrative expense for the period from the January 10, 2003, Petition Date to February 13, 2003, when the order was entered allowing the Debtor-in–Possession to reject the CSSO CBA [the "Interim Period"], even though Association members did not rehearse or perform during that period.

The Association seeks an administrative expense for its members in the amount of $108,414.98,[1] arising from the Debtor-in–Possession's failure to pay wages due for three post-petition payrolls during the Interim Period. In response, the Trustee argues that these claims are not payable

---

1. This is the amount requested in the Association's Motion. At the hearing, the parties stated to the Court that they had been working on an agreement as to the actual amount remaining unpaid under the terms of the CSSO CBA and expressed confidence that they would be able to reach agreement. As a result, the parties requested that the Court limit its consideration to whether or not the Association members are entitled to an administrative expense claim for that unpaid amount.

as administrative expenses since the members did not perform services or otherwise provide benefit to the estate.

The Association advances two primary of arguments in support of its position:

1. it argues that the unpaid wages and benefits are entitled to administrative expense treatment because the Debtor–in–Possession engaged in post-petition actions which are a violation of the National Labor Relations Act [the "NLRA"]; and

2. that the Court should classify those unpaid wages and benefits as administrative expenses because the Debtor–in–Possession violated the provision in 11 U.S.C. § 1113(f) that a collective bargaining agreement may not be modified without prior Court approval.

### Effective Date of CSSO CBA Rejection

■ The Court must begin by addressing the effective termination date of a debtor-in-possession's obligations under a collective bargaining agreement where it has rejected the agreement under the provisions of 11 U.S.C. § 1113. The Court finds that the terms of a collective bargaining agreement remain in full force and effect until rejected under § 1113. In other words, § 1113 represents a departure from the rule of § 365(g)(1) [2] that rejection of an executory contract relates back to the filing date of the petition.

That conclusion is mandated by several subsections of § 1113. First and foremost, subsection (f) provides that "[n]o provision of this title shall be construed to permit a trustee to unilaterally terminate or alter

---

**2.** Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

any provisions of a collective bargaining agreement prior to compliance with the provisions of this section." 11 U.S.C. 1113(f). Clearly, that subsection prohibits any unilateral modification to a debtor-in-possession's obligations under a labor contract prior to full compliance with the provisions of § 1113. In *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984 (2nd Cir.1990), the court quoted Collier's explanation of the effect of that statute:

> "Section 1113(f) reverses that part of *Bildisco & Bildisco* which held that a trustee or debtor in possession was not legally bound to a collective bargaining agreement subsequent to the filing date and prior to the court determination of the application for authority to reject such agreement. The trustee or debtor in possession must adhere to the terms of the collective bargaining agreement unless the court approves the application for rejection pursuant to section 1113(c) or grants interim relief under section 1113(e)."

*Id.* at 990 (quoting 5 COLLIER ON BANKRUPTCY, ¶ 1113.01 at 1113–11 (15th ed.1990)). Thus, the *Ionosphere Clubs* court concluded

> from the language of the statute, statements made by the sponsors of the legislation, and the context in which it was enacted, that Congress intended that a collective bargaining agreement remain in effect and that the collective bargaining process continue after the filing of a bankruptcy petition unless and until the debtor complies with the provisions of § 1113.

---

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition . . . .
11 U.S.C. § 365(g)(1).

*Id.; see, also, Adventure Resources Inc. v. Holland,* 137 F.3d 786, 796 (4th Cir.1998) ("We agree that the language employed by Congress in § 1113 is unequivocal, insofar as it goes. It plainly imposes a legal duty on the debtor to honor the terms of a collective bargaining agreement, at least until that agreement is properly rejected.").

Unfortunately, the determination of the date that the employer's obligations terminate under a rejected collective bargaining agreement is not clearly addressed in § 1113 as it is in § 365 with respect to other executory contracts. Therefore, the Court might take guidance from § 365 which does dictate how damages resulting from rejection of an executory contract are to be handled. That section specifically provides that "the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease ... immediately before the date of the filing of the petition." 11 U.S.C. § 365(g)(1). If the Court were to take guidance from § 365(g)(1), the case of *N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), describes the result as follows:

> the implications from the decided cases are that the relation back of contract rejection to the filing of the petition in bankruptcy involves more than just priority of claims. Damages on the contract that result from the rejection of an executory contract, as noted, must be administered through bankruptcy and receive the priority provided general unsecured creditors.

*Id.* at 531, 104 S.Ct. at 1199.

■ However, to the extent possible, the Court must read the different sections of the Code in harmony with one another. *See Shumate v. Patterson,* 943 F.2d 362, 365 (4th Cir.1991) ("following the rule that, whenever possible, statutes should be read

in harmony and not in conflict ... we interpret these in such a way as to give full effect to both ERISA and the Bankruptcy Code ...."); *McKowen v. I.R.S. (In re McKowen),* 263 B.R. 618, 621 (D.Colo. 2001) ("The court has an obligation to attempt to harmonize two statutes that appear to conflict."). But, a reading of the Code which allows rejection of a collective bargaining agreement under the provisions of § 1113 to relate back to just prior to the filing of the petition, would read § 1113(f) completely out of the Code. There would be little point in strictly prohibiting the parties from modifying their collective bargaining agreement obligations prior to obtaining court approval and then turning the clock back to the petition date once rejection is approved. Such a reading gives no effect to § 1113(f).

■ Certainly, where an amendment to the Code that addresses a specific issue appears to conflict with an earlier enactment, which is more general in terms, the specific must take precedence over the general. *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987); *American Freight System, Inc. v. Interstate Commerce Comm'n (In re American Freight System, Inc.),* 179 B.R. 952, 960 (Bankr.D.Kan.1996) ("it is a cardinal canon of statutory construction that a more recent and specific statute must prevail in a conflict with an older, more general statute."). To avoid the result of the *Bildisco* court's treatment of labor agreements, Congress did not leave much room for interpretation. The Code plainly states that "[t]he debtor in possession, or the trustee ... may assume or reject a collective bargaining agreement *only in accordance with the provisions of this section.*" 11 U.S.C. § 1113(a) (emphasis added). Thus, where it appears that the general practice of dealing with executory con-

tracts under § 365 conflicts with the express language of § 1113, the Court must endeavor to give full effect to the language of § 1113.

In addition to causing conflict with the language of § 1113(f), giving effect to the relation back language of § 365(g)(1) in this case would also make § 1113(e) superfluous. That subsection states:

> If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

11 U.S.C. § 1113(e). Congress chose to give chapter 11 debtors-in-possession a "safety valve" in § 1113(e), which they may use to avoid the sometimes harsh result of being fully bound to the terms of a collective bargaining agreement during the period from the petition date to the time the rejection of the agreement is approved by the court. Pursuant to that subsection, a debtor may obtain interim relief upon a showing of necessity or in order to avoid irreparable harm. Furthermore, that subsection gives the bankruptcy court the extraordinary command that any hearing under § 1113(e) must be scheduled "in accordance with the needs of the trustee." 11 U.S.C. § 1113(e). If rejection in the context of § 1113 relates back prior to the petition date, then this Court is hard pressed to understand how any harm resulting from being bound to the contract in that interim period could be "irreparable" or why Congress would have found it necessary to include the remarkable provision that a court must schedule a hearing on such interim relief in accordance with the needs of the trustee.

Congress also shows uncommon concern for the needs of the debtor-in-possession in § 1113(d). That subsection commands that "[u]pon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application." 11 U.S.C. 1113(d)(1). In addition, "[t]he court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing." 11 U.S.C. § 1113(d)(2).

Throughout § 1113, Congress has shown its concern for the well-being of the debtor-in-possession by providing an interim procedure to relieve it from the burdens of its collective bargaining agreement, pending a final decision on rejection, and by setting stringent deadlines for the courts to observe in dealing with applications to reject collective bargaining agreements. Section 1113 gives employees covered by a collective bargaining agreement some procedural protections against an arbitrary rejection of the labor contract by providing that the employer's obligations remain in full force and effect unless and until the bankruptcy court approves rejection. But, at the same time, it gives exceptional rights to a debtor-in-possession to get an early hearing on a motion to reject and assures a debtor-in-possession of a prompt decision. It also sets out a procedure to obtain interim relief. Those expeditious procedures and the opportunity for extraordinary interim relief are simply inconsistent with the notion that rejection of the collective bargaining agreement would relate back to the petition date as generally provided for in § 365(g)(1). Therefore,

the Court holds that the rejection of a collective bargaining agreement under § 1113 is effective as of the date of the Court's order approving the rejection and said rejection does not relate back.

### Payment Priority of CSSO CBA Obligations

█ Answering that initial question does not provide an answer to the ultimate issue in this case. It is all well and good to know that the Debtor–in–Possession remained fully bound to the terms of the CSSO CBA post-petition until the date the Court approved rejection of the agreement. But, the more difficult question is to determine the payment priority that the Court should assign to the Debtor–in–Possession's obligations under the CSSO CBA, incurred during the Interim Period, that remained unperformed or unpaid as of the time the rejection of the agreement was approved.

The Association asserts that CSSO's post-petition obligations under the CSSO CBA should be treated as administrative expenses as a penalty for the Debtor–in–Possession's violation of § 1113(f). The Court disagrees. In the first place, it is not clear to the Court whether the Debtor–in–Possession's failure to make post-petition payments under the CSSO CBA and failure to comply with all contract terms, without more, constitutes a unilateral modification of the contract terms prohibited by § 1113(f). The case law is not uniform on this point. Some courts draw a distinction between a simple breach of the contract terms and a unilateral modification that would violate § 1113(f). *Birmingham Musicians' Protective Association v. Alabama Symphony Ass'n (In re Alabama Symphony Ass'n)*, 211 B.R. 65, 69 (N.D.Ala.1996) ("One line [of cases] finds that a breach of contract is not a violation of § 1113(f); the other line of cases finds that failure to perform the obligations prior to obtaining court permission to do so is a violation of § 1113(f).")

Furthermore, to adopt the Association's argument would require the Court to enlist the aid of 11 U.S.C. § 105's equitable powers to fashion a penalty for violation of § 1113(f). Certainly, the Court finds no language in § 1113, or elsewhere in the Code or case law for that matter, that supports imposition of such a penalty. Whereas, § 105 may be an essential gap-filler to carry out the clear intent of the Code, the Court does not find that intention to be clearly enough expressed so as to justify the use of § 105 in a case of this nature.

By the same token, if the Court were to follow the Association's other line of argument, that the obligations should be given administrative expense priority as a penalty for violation of the NLRA, it would also have to rely on § 105's equitable powers to fashion such a remedy. The Court declines to do so because it finds even less support in the Bankruptcy Code or the cases for imposition of a penalty for a purported violation of the NLRA.

Rather, the Court believes that its determination of the payment priority of the unperformed post-petition obligations under the CSSO CBA requires it to focus on the interplay between the obligations mandated under § 1113 and payment priorities set out in 11 U.S.C. §§ 503 and 507. That is a matter that has not been addressed by the Court of Appeals for the Tenth Circuit, but it has been examined by the Courts of Appeals for the Second, Third, Fourth and Sixth Circuits. *Adventure Resources, Inc. v. Holland*, 137 F.3d 786 (4th Cir.1998); *Air Line Pilots Ass'n v. Shugrue (In re Ionosphere Clubs)*, 22 F.3d 403 (2nd Cir. 1994); *In re Roth American, Inc.*, 975 F.2d 949 (3rd Cir.1992); *United Steelworkers v. Unimet Corp. (In re Unimet Corp.)*, 842 F.2d 879 (6th Cir.1988).

■ The cases demonstrate that the weight of authority holds that § 1113 does not in any way conflict with or alter the payment priority scheme set out in §§ 503 and 507. *Adventure Resources*, 137 F.3d at 796–97; *Ionosphere Clubs*, 22 F.3d at 407–408; *Roth American*, 975 F.2d at 956–57.[3] Therefore, the Court will examine CSSO's post-petition obligations to Association members in the light of payment priorities established under §§ 503 and 507.

Section 503(b)(1)(A) allows a claim to be paid as an expense of administration when the claim consists of "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). Pursuant to § 507, "administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28" are entitled to first priority payment. 11 U.S.C. § 507(a)(1).

■ In the case of *In re Amarex*, 853 F.2d 1526 (10th Cir.1988), the court adopted the formulation in *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976), that sets two requirements for approval of an administrative expense under § 503(b)(1)(A): 1) it must result from a *post-petition* transaction with the debtor-in-possession or trustee; and 2) it may be allowed only to the extent that the consideration supplied by the creditor was both (a) beneficial and (b) supplied to the debtor-in-possession in the operation of its business. *Amarex*, 853 F.2d at 1530.

It is important to note that the reason the parties and the Court have engaged in this exercise, and the factor that makes this case unusual, is the fact that CSSO, while a Debtor–in–Possession, cancelled concerts and rehearsals that were scheduled during the Interim Period, so Association members did not rehearse and did not perform in concerts. Nonetheless, under the terms of the CSSO CBA, they are entitled to be paid for a minimum number of pay periods regardless of whether or not rehearsals are held or actual performances are staged.[4] "Ordinarily a collective bargaining agreement ... neither obligates any employee to perform work nor requires the employer to provide work." *In re Continental Airlines Corp.*, 901 F.2d 1259, 1264 (5th Cir.1990). However, the CSSO CBA *is* different in that regard. It *does* require payment to be made at times even when no work is performed. In that way, CSSO bargained for and obtained a measure of flexibility in staging performances. At the same time, it preserved stability by retaining a readily-available, qualified workforce. In return for that flexibility, the provision for payment of a minimum number of pay periods gave Association members a measure of income security.

**3.** Some courts have interpreted the *Unimet* decision to require that damages resulting from rejection of a collective bargaining agreement should be paid as a "superpriority." *Ionosphere Clubs*, 22 F.3d at 408 ("The broad language used by the court in *Unimet* has been construed to require a superpriority for all claims for collectively bargained benefits."). But this Court cannot reconcile that interpretation with the language actually used by the court in *Unimet*. *See Roth American*, 975 F.2d at 957 n. 10 ("We note that it is not clear whether the Sixth Circuit in *Unimet* determined what priority should be accorded the union's claim; the court only reversed the judgment of the district court 'to the extent that it held that 11 U.S.C. § 1113 does not protect the interests of retirees.'") (quoting *Unimet*, 842 F.2d at 886).

**4.** For both long and short contract players, Section VI. A. of the CSSO CBA provides that "Musicians will be compensated for all guaranteed services, used or unused."

The Trustee asserts that the Association's claims are unsecured. Because the members did not rehearse or perform post-petition, no payment is due to them as an administrative expense. In order for this Court to adopt the Trustee's position, the Court would have to determine that the status which the Association members occupied during the Interim Period, under their unmodified contract, conferred no benefit to the Debtor–in–Possession worthy of administrative expense treatment under §§ 503 and 507. But, such a finding is not supportable under the facts of this rather unique case and the case law. The Court believes that, in the context of post-petition obligations related to collective bargaining agreements, those obligations must be paid as § 503(b)(1)(A) administrative expenses at the rate provided for under the collective bargaining agreement and to the extent that the bargaining unit members complied with their obligations under the collective bargaining agreement post-petition. *See, e.g., Roth American,* 975 F.2d at 957; *Teamsters Industrial Security Fund v. World Sales, Inc. (In re World Sales, Inc.),* 183 B.R. 872, 878 (9th Cir. BAP 1995) *In re Chicago Lutheran Hosp. Ass'n,* 75 B.R. 854, 857 (Bankr. N.D.Ill.1987).

In this case, the evidence is that the Association members provided consideration in compliance with the CSSO CBA to the Debtor–in–Possession post-petition by being ready and willing to perform. That fact compels the conclusion that payment of post-petition wages due to the Association members, in accordance with the CSSO CBA, is as an expense of administration. The Debtor–in–Possession chose not to use the Association members. It cancelled performances rather than lose more money by actually staging the scheduled events. But that fact does not alter the Debtor–in–Possession's obligations under the structure of the CSSO CBA.

The Trustee cites *In re Amarex,* 853 F.2d 1526 (10th Cir.1988), as support for his position. As noted above, *Amarex* adopted the oft-cited *Mammoth Mart* test for allowance of administrative expenses. That analysis is commonly used to determine whether an expense incurred post-petition is entitled to § 503(b)(1)(A) administrative expense treatment outside the realm of collective bargaining agreements. But, the Court does not find examples of the *Mammoth Mart* test being applied to administrative expense claims involving rejection of collective bargaining agreements under § 1113, nor does this Court believe that such an analysis is applicable in the context of post-petition obligations arising under collective bargaining agreements. The Court notes that *Mammoth Mart* predates the enactment of § 1113 and, therefore, could not foresee its implications.

First, the question of whether the services rendered to a debtor are the result of a post-petition transaction, as required under *Mammoth Mart,* is rendered moot by the language of § 1113(f). It is commonly held that an obligation will qualify as arising from a post-petition transaction with a debtor-in-possession "only when the debtor-in-possession's actions themselves—that is, considered apart from any obligation of the debtor—give rise to a legal liability that the claimant is entitled to the priority of a cost and expense of administration." *Bachman v. Commercial Financial Services, Inc. (In re Commercial Financial Services, Inc.),* 246 F.3d 1291, 1294 (10th Cir.2001) (quoting *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950, 955 (1st Cir.1976)). But, it is unnecessary for a debtor-in-possession to perform any affirmative act in order to give rise to legal liability in light of the language of § 1113(f) binding it to the terms of its collective bargaining agree-

ment unless and until rejection is approved by the bankruptcy court.

The second *Mammoth Mart* requirement that an expense may be allowed only to the extent that the consideration supplied by the creditor was both (a) beneficial and (b) supplied to the debtor-in-possession in the operation of its business also appears somewhat modified by operation of § 1113. That is, in the labor contract context, the courts do not engage in an independent examination of whether post-petition services were ultimately beneficial to the debtor-in-possession. Nor do the courts look outside of the collective bargaining agreement to independently value services provided to a debtor-in-possession. Where the consideration called for in the collective bargaining agreement is provided to the debtor-in-possession, post-petition, then the compensation called for in the collective bargaining agreement, and related to those post-petition services, is given administrative expense treatment. In that way, the courts respect the language of § 1113(f) that binds a debtor-in-possession to the terms of its collective bargaining agreement and also faithfully adhere to the payment priorities set out in §§ 503 and 507. The following cases illustrate this analytical framework in the context of agreements subject to the provisions of § 1113.

In the case of *In re Roth American, Inc.*, 975 F.2d 949 (3rd Cir.1992), the court considered the union employees' claims to administrative expense priority for vacation pay and severance pay. There was no dispute as to the validity of the employees' claims. The only dispute was as to the priority to be accorded those claims. The employees' claims for severance pay and vacation pay were allowed as a priority, but only to the extent that those benefits were earned post-petition. That is, the court allowed administrative expense treatment for the proportional amount of the vacation and severance claims that were directly related to hours worked post-petition.

The court did not engage in a *Mammoth Mart* type examination of whether or not the vacation and severance pay obligations were incurred by the debtor-in-possession pursuant to a post-petition transaction. The Court did not discuss whether or not the payment of those claims for vacation pay and severance pay represented a benefit to the estate as it would have under a *Mammoth Mart* analysis. The court did not look outside of the collective bargaining agreement to determine if the amount of the claims represented an appropriate value for the services provided. Thus, the *Roth* court streamlined its analysis to look at whether the services contemplated in the collective bargaining agreement were rendered by the employees post-petition and, to the extent that they were, it allowed administrative expense payment for all benefits that accrued under the collective bargaining agreement based upon those post-petition services.

The case of *Teamsters Industrial Security Fund v. World Sales, Inc. (In re World Sales, Inc.)*, 183 B.R. 872 (9th Cir. BAP 1995), addressed the case of a debtor-in-possession which terminated its union employees 18 days after it filed for protection under chapter 11. The employees made a claim for payment of a full month of health insurance premiums based upon those 18 days of work. The appellate panel reversed the bankruptcy court determination that the employees were entitled to have only 18/31 of the monthly premium paid as an administrative expense. The collective bargaining agreement remained unmodified through the date of the employees' termination and it provided that the employer would pay a full month of health benefits for any em-

ployee who worked at least one day during the month. Thus, the appellate panel looked to the terms of the unmodified collective bargaining agreement to determine what was due to the employees on account of their post-petition services. The court observed that "[s]ection 1113 was enacted to protect employees during the interim between the filing of the bankruptcy petition and court-supervised modification or ultimate rejection of the CBA. During this period, working employees benefit the estate. *Their rights accrue as services are rendered on the basis provided for by the CBA." Id.* at 878 (emphasis added). Because the collective bargaining agreement called for payment of a full month of healthcare premium in compensation for any labor performed during the month in excess of one day, that is what the court allowed as an administrative expense.

Again, in the *World Sales* case, the primary reference point was the collective bargaining agreement itself. To the extent that the employees held up their end of the bargain under that agreement, post-petition, administrative expense treatment was allowed to the full extent provided for in the agreement. The court did not engage in an examination of the *Mammoth Mart* factors.

By contrast to the way the above Third Circuit (*Roth American* ) and Ninth Circuit B.A.P. (*World Sales* ) cases analyze administrative expense claims in the labor contract context, the Third and Ninth Circuits apply the much more rigorous examination suggested by *Mammoth Mart* to other types of administrative expense claims.

In *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.),* 181 F.3d 527 (3rd Cir.1999), the court examined the claim for a break-up fee filed by a disappointed potential buyer of the debtor-in-possession's assets. The court treated the claim as a claim for an administrative expense and cited to language from the *Mammoth Mart* case as stating the appropriate standard to be applied to § 503(b)(1)(A) administrative expense claims. *Id.* at 532–33. The court found that bidding at the sale satisfied the requirement of a post-petition transaction with the debtor-in-possession. *Id.* at 533. But, the court found that Calpine had strong financial incentives to participate in the bidding for the debtor's assets and that a break-up fee was not necessary to induce Calpine to take part in the bidding. *Id.* at 537. Therefore, under *Mammoth Mart,* the court found no benefit to the estate and upheld the lower courts' denial of the administrative expense claim. *Id.* at 537–38.

In *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus.,Inc.),* 66 F.3d 1091 (9th Cir.1995), the Ninth Circuit adopted the *Mammoth Mart* analysis for § 503(b)(1)(A) administrative expense claims. *Id.* at 1094; *Abercrombie v. Hayden Corp (In re Abercrombie),* 139 F.3d 755, 757 (9th Cir.1998).[5] The claim before the court was based upon a pre-petition software licensing agreement entered into between the debtor and Microsoft. It called for payment of a fee for each copy of Microsoft Word that the debtor distributed to its customers. It also provided for payment of $2,750,000.00 in five installments as the minimum due to Microsoft under

5. Although the *DAK* court does not cite the *Mammoth Mart* case, it does quote the *Mammoth Mart* test from a different case. In the later *Abercrombie* case, the Ninth Circuit states that *DAK* did adopt *Mammoth Mart* as the appropriate administrative expense test in order to "limit the administrative expense priority to those situations where the purpose of rehabilitation will be served." *Abercrombie,* 139 F.3d at 757.

the agreement. *Id.* at 1092–93. Pre-petition, the debtor paid its obligation according to the payment schedule, but owed approximately half of the minimum amount at the time it filed its petition. *Id.* at 1093. Post-petition, the debtor-in-possession continued to distribute Microsoft Word but ultimately rejected the licensing agreement after approximately 11 months. *Id.* In viewing the economic realities of the transaction, the court determined that the transaction under review was a pre-petition transaction and that Microsoft provided no new consideration to the debtor-in-possession after the petition date. *Id.* at 1095–96. Consequently, the transaction failed the *Mammoth Mart* test because it was not the result of a post-petition transaction with the debtor-in-possession, nor was any post-petition benefit provided to the debtor-in-possession.

As can be seen in the above examples, the Third and Ninth Circuits, have adopted language from the *Mammoth Mart* case as the standard for reviewing a claim for administrative expenses under § 503(b)(1)(A). Those courts rigorously apply that test in cases which fall outside of the union labor contract context, where § 1113 does not pertain. However, where those courts do address administrative expense claims which arise from collective bargaining agreements, that test is not used. The Tenth Circuit has also adopted *Mammoth Mart* as the appropriate analysis for administrative expense claims, but it has yet to speak with respect to *Mammoth Mart's* applicability where such claims arise from post-petition obligations under a collective bargaining agreement.

The Court notes that, during the Interim Period, CSSO was still a Debtor–in–Possession under chapter 11. It was not until a month after the Court approved rejection of the CSSO CBA, on March 12, 2003, that CSSO filed its Debtor in Possession's Notice of Conversion of Case to Chapter 7. The natural inference that the Court draws from this fact is that, until March 12, 2003, CSSO was attempting to reorganize. This is no small point. A symphony orchestra which does not have a group of musicians, who are contractually bound to rehearse and perform when called upon to do so by the orchestra management, is quite inconsistent with the status occupied by the Debtor–in–Possession throughout the Interim Period as an entity actively engaged in the process of reorganizing its affairs.

The record before this Court shows no action taken by CSSO that is inconsistent with its status as a reorganizing Debtor–in–Possession. During the Interim Period, CSSO made no application under § 1113(e) to obtain interim relief from its obligations pending a final hearing on its application to reject the CSSO CBA. It made no applications to sell assets under § 363, nor did it seek to employ a professional for the purpose of selling any assets. Significantly, it did not lay off its employees during the Interim Period.[6] Furthermore, in the communications of Larry Barrett, the Executive Director of CSSO, with Diane Merrill, the representative of the Association, [Movant's Exhibits 6,7 and 9] Mr. Barrett consistently speaks of his hopes to continue with the activities of CSSO. Therefore, the Court finds from the facts before it that the maintenance of the CSSO's workforce was necessary and appropriate to its status as a Debtor–in–Possession in the process of reorganizing its business. Certainly, it would be unsupportable, in any rational sense, for this Court to find that it

---

**6.** The Court is aware that the Debtor–in–Possession would have lost money by conducting the post-petition concerts, but that fact does not appear to have been brought to the Court's attention in any fashion prior to the hearing on rejection of the CSSO CBA.

is unnecessary for a symphony orchestra, which is in the process of reorganizing its affairs, to maintain a readily available workforce of musicians.

In addition, the Court finds that the Debtor–in–Possession's employees held up their end of the bargain under the CSSO CBA. The uncontradicted evidence before the Court is that Association members were ready, willing and able to perform services if called upon to do so by the Debtor–in–Possession's management. In that sense, the CSSO CBA is hardly typical of most labor contracts. Under most labor contracts, workers are paid for actual labor performed. But the contract at issue here specifically recognizes that CSSO must maintain the flexibility to schedule rehearsals and performances as it sees fit. At the same time, it also recognizes that it is essential to maintain CSSO's workforce even when no labor is performed. To that end, the contract provides that Association members will be paid for a minimum number of pay periods whether or not management schedules actual rehearsals or performances.

The pre-petition bargain struck between these parties, in essence, is that Association members will be ready, willing and able to engage in activities scheduled by CSSO in accordance with the CSSO CBA and, in return for that consideration, CSSO guarantees to pay Association members for a minimum number of services whether they are actually rendered or not. Dianne Merrill testified, without contradiction, that the Association members were ready, willing and able to perform with appropriate notice under the terms of the CSSO CBA. Thus, the evidence reveals that Association members did supply the post-petition consideration to support their side of that bargain.

The value of the Association members' post-petition services is defined by the terms of the CSSO CBA, which remained in full force and effect during the Interim Period by operation of § 1113(f). The CSSO CBA clearly assigns a value to the Association members' status of being available to perform, even when management schedules no rehearsals or performances. That value finds its expression in the terms of the CSSO CBA which require Association members to be paid for a minimum number of services, whether or not those services are actually provided. The Court finds no basis to deviate from the stated terms of the CSSO CBA, indeed the Court believes that the language of § 1113(f) prohibits any such deviation.

Payment of full contract obligations to Association members, when they performed no labor for the Debtor–in–Possession during the Interim Period, may seem a harsh result for the chapter 7 estate and its other creditors. But the Court must reiterate that it is a result which could have been avoided. In § 1113(e), the Code lays out a roadmap and standards for obtaining relief from those obligations during the Interim Period. In § 1113(f), the Code makes it clear that, absent full compliance with § 1113, the express provisions of the CSSO CBA could not be terminated or altered. The plain language of § 1113 suggests no other outcome in a case where the Debtor–in–Possession did not seek interim relief under § 1113(e).

The Trustee suggests that the case of *Gen. Am. Transp. Corp. v. Martin (In re Mid Region Petroleum, Inc.)*, 1 F.3d 1130 (10th Cir.1993), should control the resolution of this matter. In that case, the debtor leased railcars from General American Transportation Corporation ["GATX"] pre-petition. The trustee appointed in the case retained possession of GATX's railcars for at least seven months following the filing of the debtor's chapter 11 petition. The trustee did not utilize any of the

railcars after the petition date. Ultimately, he rejected the leases. The Tenth Circuit denied administrative expense treatment for the rental charges that accrued post-petition while the trustee maintained possession of the railcars. But, that case was controlled by § 365 and, pursuant to § 365(g)(1), the rejection related back to just prior to the filing of the petition. Thus, the court analyzed entitlement to administrative expense treatment under the factors announced in the *Mammoth Mart* case. Because the court found that possession of the railcars did not constitute a benefit to the bankruptcy estate, it denied administrative expense treatment.

The Court does not question the appropriateness of using the *Mammoth Mart* test in analyzing a creditor's entitlement to receive administrative expense treatment in a case that falls outside of the ambit of § 1113. Indeed, it is bound by Tenth Circuit precedent on that question. But, as discussed above, incorporation of § 1113 into the Bankruptcy Code has subsumed much of the *Mammoth Mart* analysis when collective bargaining agreements are involved. As a consequence, the fact that the Association members provided consideration to CSSO as contemplated under the CSSO CBA is sufficient for this Court to find that CSSO has received the benefit which it bargained for from the Association members and made part of the CSSO CBA.

By contrast, the debtor in *Mid Region* had ceased its business operations. The only benefit cited by the creditor was that continued possession of the railcars made it easier to resume the debtor's business operations or to sell the company with the leases in tact. *Id.* at 1133. While acknowledging that the trustee did reap some benefit from his post-petition possession of the railcars, the court did not find that to be the kind of benefit that would justify elevating the debt to GATX above other creditors. In this case, the record contains no indication that CSSO had decided to cease its business operations prior to the approval of its application to reject the CSSO CBA. Even though it had cancelled scheduled concerts and rehearsals, the Debtor–in–Possession did not lay off its workforce; it never notified Association members that their services would not be required in the future. The Court finds that *Mid Region* is inapposite to the case currently before it.

## CONCLUSION

The Court concludes that an application for payment of an administrative expense claim for collective bargaining agreement obligations which remain unpaid after rejection of the agreement must be reviewed pursuant to 11 U.S.C. § 503(b)(1)(A). There is nothing in the Code to suggest that such claims should receive superpriority treatment or that 11 U.S.C. § 1113 justifies the Court in stepping outside of 11 U.S.C. § 507 to determine the priority to be accorded to such a claim.

But the Court does find that the provisions of § 1113 bind the Debtor–in–Possession to the terms of the unmodified collective bargaining agreement until the Court approves rejection of the contract. The requirements of a traditional administrative expense analysis that the expense be the result of a post-petition transaction with the debtor-in-possession, and that the consideration provided to a debtor-in-possession post-petition result in a benefit to the estate, do not apply to obligations under a collective bargaining agreement. Because § 1113 binds a debtor-in-possession to the terms of its collective bargaining agreement unless and until it is rejected, the proper administrative expense analysis must use the terms of that agreement as the starting point. So long as the

bargaining unit members provide consideration to a debtor-in-possession as contemplated by the collective bargaining agreement, then whatever obligation is owed to the workers under that agreement's unmodified terms, and based upon the consideration provided by the workers, is an allowable administrative expense under 11 U.S.C. § 503(b)(1)(A).

In this case, even though the Debtor-in-Possession cancelled scheduled rehearsals and performances, the CSSO CBA requires payment to the Association members for a minimum number of services whether or not the members actually perform services. The agreement does not require actual labor to be performed for the Association members to be entitled to payment. The evidence was uncontradicted that the members stood ready to perform in rehearsals or concerts in accordance with the terms of the CSSO CBA. Under this very unique agreement, that is all that they needed to do in order to be entitled to payment. Therefore, the wage payments due to the Association members do qualify as an expense of administration.

In accordance with the above discussion, it is

**ORDERED** that the Application of the Pikes Peak Musicians Association for the Approval and Payment of Administrative Expense is hereby GRANTED; it is further

**ORDERED** that the Trustee is directed to make payment of obligations which accrued under the collective bargaining agreement between the CSSO and the Association from the petition date through February 13, 2003, as a Chapter 11 administrative expense pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(1).